# FEDERAL TRADE COMMISSION *v.* SUPERIOR COURT TRIAL LAWYERS ASSOCIATION ET AL.

No. 88–1198.   Argued October 30, 1989—Decided January 22, 1990*

---

*Together with No. 88–1393, *Superior Court Trial Lawyers Association et al.* v. *Federal Trade Commission,* also on certiorari to the same court.

412

STEVENS, J., delivered the opinion for a unanimous Court with respect to Parts I, II, III, and IV, and the opinion of the Court with respect to Parts V and VI, in which REHNQUIST, C. J., and WHITE, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, *post*, p. 436. BLACKMUN, J., filed an opinion concurring in part and dissenting in part, *post*, p. 453.

*Ernest J. Isenstadt* argued the cause for petitioner in No. 88–1198 and respondent in No. 88–1393. On the briefs were *Acting Solicitor General Bryson, Acting Assistant Attorney General Boudin, Kevin J. Arquit, Jay C. Shaffer,* and *Karen G. Bokat.*

*Willard K. Tom* argued the cause for respondents in No. 88–1198 and petitioners in No. 88–1393. With him on the brief for the Superior Court Trial Lawyers Association were *Donald I. Baker, David T. Shelledy,* and *Michael L. Denger. Douglas E. Rosenthal* filed a brief for Ralph J. Perrotta et al.†

----

†Briefs of *amici curiae* urging reversal were filed for the State of South Dakota et al. by *Roger A. Tellinghuisen,* Attorney General of South Dakota, and *Jeffrey P. Hallem,* Assistant Attorney General, *Robert K. Corbin,* Attorney General of Arizona, and *Alison J. Butterfield, Douglas B. Baily,* Attorney General of Alaska, and *Richard D. Monkman,* Assistant Attorney General, *Duane Woodard,* Attorney General of Colorado, and *Thomas P. McMahon,* First Assistant Attorney General, *Charles M. Oberly III,* Attorney General of Delaware, and *David G. Culley,* Deputy Attorney General, *Warren Price III,* Attorney General of Hawaii, *Thomas J. Miller,* Attorney General of Iowa, and *John R. Perkins,* Deputy Attorney General, *Robert T. Stephan,* Attorney General of Kansas, *John W. Campbell,* Deputy Attorney General, and *Mark S. Braun,* Assistant Attorney General, *Frederic J. Cowan,* Attorney General of Kentucky, and *James M. Ringo,* Assistant Attorney General, *William J. Guste, Jr.,* Attorney General of Louisiana, and *Anne F. Benoit,* Assistant Attorney General, *J. Joseph Curran, Jr.,* Attorney General of Maryland, and *Michael F. Brockmeyer* and *Ellen S. Cooper,* Assistant Attorneys General, *Robert M. Spire,* Attorney General of Nebraska, and *Dale A. Comer,* Assistant

JUSTICE STEVENS delivered the opinion of the Court.

Pursuant to a well-publicized plan, a group of lawyers agreed not to represent indigent criminal defendants in the District of Columbia Superior Court until the District of Columbia government increased the lawyers' compensation. The questions presented are whether the lawyers' concerted conduct violated § 5 of the Federal Trade Commission Act and, if so, whether it was nevertheless protected by the First Amendment to the Constitution.[1]

## I

The burden of providing competent counsel to indigent defendants in the District of Columbia is substantial. During 1982, court-appointed counsel represented the defendant in approximately 25,000 cases. In the most serious felony cases, representation was generally provided by full-time employees of the District's Public Defender System (PDS). Less serious felony and misdemeanor cases constituted about

---

Attorney General, *Jim Mattox*, Attorney General of Texas, *Mary F. Keller*, First Assistant Attorney General, *Lou McCreary*, Executive Assistant Attorney General, and *Allene D. Evans*, Assistant Attorney General, *Donald J. Hanaway*, Attorney General of Wisconsin, *Mark E. Musolf*, Deputy Attorney General, and *Kevin J. O'Connor* and *Matthew J. Frank*, Assistant Attorneys General; for the American Civil Liberties Union et al. by *Wm. Warfield Ross, Gerald P. Norton, John A. Powell, Arthur B. Spitzer*, and *Elizabeth Symonds;* and for the National Association of Criminal Defense Lawyers by *Rick Harris*.

Briefs of *amici curiae* urging affirmance were filed for the American Medical Association by *Jack R. Bierig* and *Carter G. Phillips;* and for the Washington Council of Lawyers et al. by *Andrew J. Pincus*.

[1] Section 5(a)(1) of the Federal Trade Commission Act, 38 Stat. 719, as amended, 15 U. S. C. § 45(a)(1), provides:

"Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

The First Amendment to the Constitution provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

85 percent of the total caseload. In these cases, lawyers in private practice were appointed and compensated pursuant to the District of Columbia Criminal Justice Act (CJA).[2]

Although over 1,200 lawyers have registered for CJA appointments, relatively few actually apply for such work on a regular basis. In 1982, most appointments went to approximately 100 lawyers who are described as "CJA regulars." These lawyers derive almost all of their income from representing indigents.[3] In 1982, the total fees paid to CJA lawyers amounted to $4,579,572.

In 1974, the District created a Joint Committee on Judicial Administration with authority to establish rates of compensation for CJA lawyers not exceeding the rates established by the federal Criminal Justice Act of 1964. After 1970, the federal Act provided for fees of $30 per hour for court time and $20 per hour for out-of-court time. See 84 Stat. 916, codified at 18 U. S. C. § 3006A (1970 ed.). These rates accordingly capped the rates payable to the District's CJA lawyers, and could not be exceeded absent amendment to either the federal statute or the District Code.

Bar organizations began as early as 1975 to express concern about the low fees paid to CJA lawyers. Beginning in 1982, respondents, the Superior Court Trial Lawyers Association (SCTLA) and its officers, and other bar groups sought to persuade the District to increase CJA rates to at least $35 per hour. Despite what appeared to be uniform support for the bill, it did not pass. It is also true, however, that noth-

---

[2] D. C. Code §§ 11–2601–11–2609 (1981). In a small number of cases, the indigent defendants were represented by third-year law students or private counsel serving without compensation.

[3] As the Administrative Law Judge (ALJ) noted:

"Because of the nature of CJA practice—its long hours away from the office (assuming the CJA lawyer has an office), the deadlines of Superior Court, and the problem of meeting deadlines in other courts—CJA regulars ordinarily do not take civil cases, nor do they usually appear on the criminal side of U. S. District court." *In re Superior Court Trial Lawyers Assn.*, 107 F. T. C. 510, 522, n. 54 (1986).

ing in the record indicates that the low fees caused any actual shortage of CJA lawyers or denied effective representation to defendants.

In early August 1983, in a meeting with officers of SCTLA, the Mayor expressed his sympathy but firmly indicated that no money was available to fund an increase. The events giving rise to this litigation then ensued.

At an SCTLA meeting, the CJA lawyers voted to form a "strike committee." The eight members of that committee promptly met and informally agreed "that the only viable way of getting an increase in fees was to stop signing up to take new CJA appointments, and that the boycott should aim for a $45 out-of-court and $55 in-court rate schedule." *In re Superior Court Trial Lawyers Assn.*, 107 F. T. C. 510, 538 (1986).

On August 11, 1983, about 100 CJA lawyers met and resolved not to accept any new cases after September 6 if legislation providing for an increase in their fees had not passed by that date. Immediately following the meeting, they prepared (and most of them signed) a petition stating:

> "We, the undersigned private criminal lawyers practicing in the Superior Court of the District of Columbia, agree that unless we are granted a substantial increase in our hourly rate we will cease accepting new appointments under the Criminal Justice Act." 272 U. S. App. D. C. 272, 276, 856 F. 2d 226, 230 (1988).

On September 6, 1983, about 90 percent[4] of the CJA regulars refused to accept any new assignments. Thereafter, SCTLA arranged a series of events to attract the attention of the news media and to obtain additional support. These events were well publicized and did engender favorable editorial comment, but the Administrative Law Judge (ALJ) found that "there is no credible evidence that the District's

---

[4] The ALJ found that "at most" 13 of the CJA regulars continued to take assignments. 107 F. T. C., at 542, n. 173.

eventual capitulation to the demands of the CJA lawyers was made in response to public pressure, or, for that matter, that this publicity campaign actually engendered any significant measure of public pressure." 107 F. T. C., at 543.[5]

As the participating CJA lawyers had anticipated, their refusal to take new assignments had a severe impact on the District's criminal justice system. The massive flow of new cases did not abate,[6] and the need for prompt investigation and preparation did not ease. As the ALJ found, "there was no one to replace the CJA regulars, and makeshift measures were totally inadequate. A few days after the September 6 deadline, PDS was swamped with cases. The handful of CJA regulars who continued to take cases were soon overloaded. The overall response of the uptown lawyers to the PDS call for help was feeble, reflecting their universal distaste for criminal law, their special aversion for compelled indigency representation, the near epidemic siege of self-doubt about their ability to handle cases in this field, and their underlying support for the demands of the CJA lawyers. Most of the law student volunteers initially observed the boycott, and later all law student volunteers were limited (as they usually are) to a relatively few minor misdemeanors." *Id.*, at 544 (footnotes omitted).

---

[5] It is not clear how much of this finding by the ALJ was accepted by the Federal Trade Commission (FTC or Commission). The Court of Appeals suggested that the finding was implicitly rejected by the Commission because not expressly accepted. See 272 U. S. App. D. C. 272, 297, 856 F. 2d 226, 251 (1988). We do not rely upon the finding, and need not decide whether the Commission did indeed reject it. We note, however, that the Commission endorsed findings attributing the District's eventual change of position to a crisis resulting from the lawyers' exercise of power. 107 F. T. C., at 572, and n. 69. Those findings seem to embody the conclusion that the reversal is not attributable to public pressure or publicity.

[6] "During the period from September 6 to September 20, there was a daily average of 63 defendants on the weekday lock-up list and 43 on the Saturday list." *Id.*, at 543, n. 183.

Within 10 days, the key figures in the District's criminal justice system "became convinced that the system was on the brink of collapse because of the refusal of CJA lawyers to take on new cases." *Ibid.* On September 15, they hand-delivered a letter to the Mayor describing why the situation was expected to "reach a crisis point" by early the next week and urging the immediate enactment of a bill increasing all CJA rates to $35 per hour. The Mayor promptly met with members of the strike committee and offered to support an immediate temporary increase to the $35 level as well as a subsequent permanent increase to $45 an hour for out-of-court time and $55 for in-court time.

At noon on September 19, 1983, over 100 CJA lawyers attended an SCTLA meeting and voted to accept the $35 offer and end the boycott. The city council's Judiciary Committee convened at 2 o'clock that afternoon. The committee recommended legislation increasing CJA fees to $35, and the council unanimously passed the bill on September 20. On September 21, the CJA regulars began to accept new assignments and the crisis subsided.

## II

The Federal Trade Commission (FTC) filed a complaint against SCTLA and four of its officers (respondents) alleging that they had "entered into an agreement among themselves and with other lawyers to restrain trade by refusing to compete for or accept new appointments under the CJA program beginning on September 6, 1983, unless and until the District of Columbia increased the fees offered under the CJA program." *Id.*, at 511. The complaint alleged that virtually all of the attorneys who regularly compete for or accept new appointments under the CJA program had joined the agreement. The FTC characterized respondents' conduct as "a conspiracy to fix prices and to conduct a boycott" and concluded that they were engaged in "unfair methods of compe-

tition in violation of Section 5 of the Federal Trade Commission Act."[7]

After a 3-week hearing, the ALJ found that the facts alleged in the complaint had been proved, and rejected each of respondents' three legal defenses—that the boycott was adequately justified by the public interest in obtaining better legal representation for indigent defendants; that as a method of petitioning for legislative change it was exempt from the antitrust laws under our decision in *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.*, 365 U. S. 127 (1961); and that it was a form of political action protected by the First Amendment under our decision in *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886 (1982). The ALJ nevertheless concluded that the complaint should be dismissed because the District officials, who presumably represented the victim of the boycott, recognized that its net effect was beneficial. The increase in fees would attract more CJA lawyers, enabling them to reduce their caseloads and provide better representation for their clients. "I see no point," he concluded, "in striving resolutely for an antitrust triumph in this sensitive area when the particular case can be disposed of on a more pragmatic basis—there was no harm done." 107 F. T. C., at 561.

The ALJ's pragmatic moderation found no favor with the FTC. Like the ALJ, the FTC rejected each of respondents' defenses. It held that their "coercive, concerted refusal to deal" had the "purpose and effect of raising prices" and was illegal *per se. Id.*, at 573. Unlike the ALJ, the FTC refused to conclude that the boycott was harmless, noting that the "boycott forced the city government to increase the CJA fees from a level that had been sufficient to obtain an adequate supply of CJA lawyers to a level satisfactory to the re-

---

[7] Commissioner Pertschuk dissented from the decision to issue a complaint on the ground that it represented an unwise use of the FTC's scarce resources. He did not, however, disagree with the conclusion that a violation of law had been alleged. 107 F. T. C., at 512–513.

spondents. The city must, as a result of the boycott, spend an additional $4 million to $5 million a year to obtain legal services for indigents. We find that these are substantial anticompetitive effects resulting from the respondents' conduct." *Id.*, at 577. Finally, the FTC determined that the record did not support the ALJ's conclusion that the District supported the boycott. The FTC also held that such support would not in any event excuse respondents' antitrust violations. Accordingly, it entered a cease-and-desist order "to prohibit the respondents from initiating another boycott . . . whenever they become dissatisfied with the results or pace of the city's legislative process." *Id.*, at 602.

The Court of Appeals vacated the FTC order and remanded for a determination whether respondents possessed "significant market power." The court began its analysis by recognizing that absent any special First Amendment protection, the boycott "constituted a classic restraint of trade within the meaning of Section 1 of the Sherman Act."[8] 272 U. S. App. D. C., at 280, 856 F. 2d, at 234. The Court of Appeals was not persuaded by respondents' reliance on *Claiborne Hardware* or *Noerr*, or by their argument that the boycott was justified because it was designed to improve the quality of representation for indigent defendants. It concluded, however, that "the SCTLA boycott did contain an element of expression warranting First Amendment protection." 272 U. S. App. D. C., at 294, 856 F. 2d, at 248. It

---

[8] Section 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1, provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousands dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court."

noted that boycotts have historically been used as a dramatic means of expression and that respondents intended to convey a political message to the public at large. It therefore concluded that under *United States* v. *O'Brien,* 391 U. S. 367 (1968), a restriction on this form of expression could not be justified unless it is no greater than is essential to an important governmental interest. ⸱ This test, the court reasoned, could not be satisfied by the application of an otherwise appropriate *per se* rule, but instead required the enforcement agency to "prove rather than presume that the evil against which the Sherman Act is directed looms in the conduct it condemns." 272 U. S. App. D. C., at 296, 856 F. 2d, at 250.

Because of our concern about the implications of the Court of Appeals' unique holding, we granted the FTC's petition for certiorari as well as respondents' cross-petition. 490 U. S. 1019 (1989).

We consider first the cross-petition, which contends that respondents' boycott is outside the scope of the Sherman Act or is immunized from antitrust regulation by the First Amendment. We then turn to the FTC's petition.

## III

Reasonable lawyers may differ about the wisdom of this enforcement proceeding. The dissent from the decision to file the complaint so demonstrates. So, too, do the creative conclusions of the ALJ and the Court of Appeals. Respondents' boycott may well have served a cause that was worthwhile and unpopular. We may assume that the preboycott rates were unreasonably low, and that the increase has produced better legal representation for indigent defendants. Moreover, given that neither indigent criminal defendants nor the lawyers who represent them command any special appeal with the electorate, we may also assume that without the boycott there would have been no increase in District CJA fees at least until the Congress amended the federal statute. These assumptions do not control the case, for it is

not our task to pass upon the social utility or political wisdom of price-fixing agreements.

As the ALJ, the FTC, and the Court of Appeals all agreed, respondents' boycott "constituted a classic restraint of trade within the meaning of Section 1 of the Sherman Act." 272 U. S. App. D. C., at 280, 856 F. 2d, at 234. As such, it also violated the prohibition against unfair methods of competition in § 5 of the FTC Act. See *FTC* v. *Cement Institute*, 333 U. S. 683, 694 (1948). Prior to the boycott CJA lawyers were in competition with one another, each deciding independently whether and how often to offer to provide services to the District at CJA rates.[9] The agreement among the

---

[9] The FTC found:

" '[T]he city's purchase of CJA legal services for indigents is based on competition. The price offered by the city is based on competition, because the city must attract a sufficient number of individual lawyers to meet its needs at that price. The city competes with other purchasers of legal services to obtain an adequate supply of lawyers, and the city's offering price is an element of that competition. Indeed, an acknowledgement of this element of competition is implicit in the respondents' argument that an increase in the CJA fee was 'necessary to attract, and retain, competent lawyers.' If the offering price had not attracted a sufficient supply of qualified lawyers willing to accept CJA assignments for the city to fulfill its constitutional obligation, then presumably the city would have increased its offering price or otherwise sought to make its offer more attractive. In fact, however, the city's offering price before the boycott apparently was sufficient to obtain the amount and quality of legal services that it needed.' " 272 U. S. App. D. C., at 278, 856 F. 2d, at 232.

The Court of Appeals agreed with this analysis:

"The Commission correctly determined that the CJA regulars act as 'competitors' in the only sense that matters for antitrust analysis: They are individual business people supplying the same service to a customer, and as such may be capable, through a concerted restriction on output, of forcing that customer to pay a higher price for their service. That the D. C. government, like the buyers of many other services and commodities, prefers to offer a uniform price to all potential suppliers does not alter in any way the anti-competitive potential of the petitioners' boycott. The antitrust laws do not protect only purchasers who negotiate each transaction individually, instead of posting a price at which they will trade with all who come

CJA lawyers was designed to obtain higher prices for their services and was implemented by a concerted refusal to serve an important customer in the market for legal services and, indeed, the only customer in the market for the particular services that CJA regulars offered. "This constriction of supply is the essence of 'price-fixing,' whether it be accomplished by agreeing upon a price, which will decrease the quantity demanded, or by agreeing upon an output, which will increase the price offered." 272 U. S. App. D. C., at 280, 856 F. 2d, at 234. The horizontal arrangement among these competitors was unquestionably a "naked restraint" on price and output. See *National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.*, 468 U. S. 85, 110 (1984).

It is, of course, true that the city purchases respondents' services because it has a constitutional duty to provide representation to indigent defendants. It is likewise true that the quality of representation may improve when rates are increased. Yet neither of these facts is an acceptable justification for an otherwise unlawful restraint of trade. As we have remarked before, the "Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services." *National Society of Professional Engineers* v. *United States*, 435 U. S. 679, 695 (1978). This judgment "recognizes that all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers."

---

forward. Nor should any significance be assigned to the origin of the demand for CJA services; here the District may be compelled by the Sixth Amendment to purchase legal services, there it may be compelled by the voters to purchase street paving services. The reason for the government's demand for a service is simply irrelevant to the issue of whether the suppliers of it have restrained trade by collectively refusing to satisfy it except upon their own terms. We therefore conclude, as did the Commission, that the petitioners engaged in a 'restraint of trade' within the meaning of Section 1." *Id.*, at 281, 856 F. 2d, at 235 (footnote omitted).

*Ibid.* That is equally so when the quality of legal advocacy, rather than engineering design, is at issue.

The social justifications proffered for respondents' restraint of trade thus do not make it any less unlawful. The statutory policy underlying the Sherman Act "precludes inquiry into the question whether competition is good or bad." *Ibid.* Respondents' argument, like that made by the petitioners in *Professional Engineers*, ultimately asks us to find that their boycott is permissible because the price it seeks to set is reasonable. But it was settled shortly after the Sherman Act was passed that it "is no excuse that the prices fixed are themselves reasonable. See, *e. g.*, *United States* v. *Trenton Potteries Co.*, 273 U. S. 392, 397–398 (1927); *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, 340–341 (1897)." *Catalano, Inc.* v. *Target Sales, Inc.*, 446 U. S. 643, 647 (1980). Respondents' agreement is not outside the coverage of the Sherman Act simply because its objective was the enactment of favorable legislation.

Our decision in *Noerr* in no way detracts from this conclusion. In *Noerr*, we "considered whether the Sherman Act prohibited a publicity campaign waged by railroads" and "designed to foster the adoption of laws destructive of the trucking business, to create an atmosphere of distaste for truckers among the general public, and to impair the relationships existing between truckers and their customers." *Claiborne Hardware*, 458 U. S., at 913. Interpreting the Sherman Act in the light of the First Amendment's Petition Clause, the Court noted that "at least insofar as the railroads' campaign was directed toward obtaining governmental action, its legality was not at all affected by any anticompetitive purpose it may have had." 365 U. S., at 139–140.

It of course remains true that "no violation of the Act can be predicated upon mere attempts to influence the passage or enforcement of laws," *id.*, at 135, even if the defendants' sole purpose is to impose a restraint upon the trade of their competitors, *id.*, at 138–140. But in the *Noerr* case the alleged

restraint of trade was the intended *consequence* of public action; in this case the boycott was the *means* by which respondents sought to obtain favorable legislation. The restraint of trade that was implemented while the boycott lasted would have had precisely the same anticompetitive consequences during that period even if no legislation had been enacted. In *Noerr*, the desired legislation would have created the restraint on the truckers' competition; in this case the emergency legislative response to the boycott put an end to the restraint.

Indeed, respondents' theory of *Noerr* was largely disposed of by our opinion in *Allied Tube & Conduit Corp.* v. *Indian Head, Inc.*, 486 U. S. 492 (1988). We held that the *Noerr* doctrine does not extend to "every concerted effort that is genuinely intended to influence governmental action." 486 U. S., at 503. We explained:

> "If all such conduct were immunized then, for example, competitors would be free to enter into horizontal price agreements as long as they wished to propose that price as an appropriate level for governmental ratemaking or price supports. But see *Georgia* v. *Pennsylvania R. Co.* 324 U. S. 439, 456–463 (1945). Horizontal conspiracies or boycotts designed to exact higher prices or other economic advantages from the government would be immunized on the ground that they are genuinely intended to influence the government to agree to the conspirators' terms. But see *Georgia* v. *Evans*, 316 U. S. 159 (1942). Firms could claim immunity for boycotts or horizontal output restrictions on the ground that they are intended to dramatize the plight of their industry and spur legislative action." *Ibid.*

## IV

SCTLA argues that if its conduct would otherwise be prohibited by the Sherman Act and the Federal Trade Commission Act, it is nonetheless protected by the First Amendment rights recognized in *NAACP* v. *Claiborne Hardware Co.,*

458 U. S. 886 (1982). That case arose after black citizens boycotted white merchants in Claiborne County, Mississippi. The white merchants sued under state law to recover losses from the boycott. We found that the "right of the States to regulate economic activity could not justify a complete prohibition against a nonviolent, politically motivated boycott designed to force governmental and economic change and to effectuate rights guaranteed by the Constitution itself." *Id.,* at 914. We accordingly held that "the nonviolent elements of petitioners' activities are entitled to the protection of the First Amendment." *Id.,* at 915.

SCTLA contends that because it, like the boycotters in *Claiborne Hardware,* sought to vindicate constitutional rights, it should enjoy a similar First Amendment protection. It is, of course, clear that the association's efforts to publicize the boycott, to explain the merits of its cause, and to lobby District officials to enact favorable legislation—like similar activities in *Claiborne Hardware*—were activities that were fully protected by the First Amendment. But nothing in the FTC's order would curtail such activities, and nothing in the FTC's reasoning condemned any of those activities.

The activity that the FTC order prohibits is a concerted refusal by CJA lawyers to accept any further assignments until they receive an increase in their compensation; the undenied objective of their boycott was an economic advantage for those who agreed to participate. It is true that the *Claiborne Hardware* case also involved a boycott. That boycott, however, differs in a decisive respect. Those who joined the *Claiborne Hardware* boycott sought no special advantage for themselves. They were black citizens in Port Gibson, Mississippi, who had been the victims of political, social, and economic discrimination for many years. They sought only the equal respect and equal treatment to which they were constitutionally entitled. They struggled "to change a social order that had consistently treated them as second class citizens." *Id.,* at 912. As we observed, the campaign was not

intended "to destroy legitimate competition." *Id.*, at 914. Equality and freedom are preconditions of the free market, and not commodities to be haggled over within it.

The same cannot be said of attorney's fees. As we recently pointed out, our reasoning in *Claiborne Hardware* is not applicable to a boycott conducted by business competitors who "stand to profit financially from a lessening of competition in the boycotted market." *Allied Tube & Conduit Corp.* v. *Indian Head, Inc., supra,* at 508.[10] No matter how altruistic the motives of respondents may have been, it is undisputed that their immediate objective was to increase the price that they would be paid for their services. Such an economic boycott is well within the category that was expressly distinguished in the *Claiborne Hardware* opinion itself. 458 U. S., at 914–915.[11]

---

[10] "In *[Claiborne Hardware]* we held that the First Amendment protected the nonviolent elements of a boycott of white merchants organized by the National Association for the Advancement of Colored People and designed to make white government and business leaders comply with a list of demands for equality and racial justice. Although the boycotters intended to inflict economic injury on the merchants, the boycott was not motivated by any desire to lessen competition or to reap economic benefits but by the aim of vindicating rights of equality and freedom lying at the heart of the Constitution, and the boycotters were consumers who did not stand to profit financially from a lessening of competition in the boycotted market. *Id.*, at 914–915. Here, in contrast, petitioner was at least partially motivated by the desire to lessen competition, and, because of petitioner's line of business, stood to reap substantial economic benefits from making it difficult for respondent to compete." *Allied Tube & Conduit Corp.*, 486 U. S., at 508–509.

[11] Respondents contend that, just as the *Claiborne Hardware* boycott sought to secure constitutional rights to equality and freedom, the lawyers' boycott sought to vindicate the Sixth Amendment rights of indigent defendants. *Claiborne Hardware*, however, does not protect every boycott having a constitutional dimension. Indeed, insofar as respondents seek immunity from prosecution on the basis of their good intent, their theory of defense "is merely another variety of an age-old argument." See *United States* v. *Cullen*, 454 F. 2d 386, 392 (CA7 1971). *Claiborne Hardware* does not, and could not, establish a rule immunizing from prosecution any

Only after recognizing the well-settled validity of prohibitions against various economic boycotts did we conclude in *Claiborne Hardware* that "peaceful, political activity such as that found in the [Mississippi] boycott" are entitled to constitutional protection.[12]  We reaffirmed the government's "power to regulate [such] economic activity." *Id.*, at 912–913.  This conclusion applies with special force when a clear objective of the boycott is to economically advantage the participants.

## V

Respondents' concerted action in refusing to accept further CJA assignments until their fees were increased was thus a plain violation of the antitrust laws.  The exceptions derived from *Noerr* and *Claiborne Hardware* have no application to respondents' boycott.  For these reasons we reject the arguments made by respondents in the cross-petition.

The Court of Appeals, however, crafted a new exception to the *per se* rules, and it is this exception which provoked the

---

boycott based upon sincere constitutional concerns.  Such an exemption would authorize the government's contractors in nearly all areas to circumvent antitrust law on the basis of their own theory of the government's obligations.

[12] "A nonviolent and totally voluntary boycott may have a disruptive effect on local economic conditions.  This Court has recognized the strong governmental interest in certain forms of economic regulation, even though such regulation may have an incidental effect on rights of speech and association.  See *Giboney* v. *Empire Storage & Ice Co.*, 336 U. S. 490 [(1949)]; *NLRB* v. *Retail Store Employees*, 447 U. S. 607 [(1980)].  The right of business entities to 'associate' to suppress competition may be curtailed. *National Society of Professional Engineers* v. *United States*, 435 U. S. 679 [(1978)].  Unfair trade practices may be restricted.  Secondary boycotts and picketing by labor unions may be prohibited, as part of 'Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife.' *NLRB* v. *Retail Store Employees, supra*, at 617–618 (BLACKMUN, J., concurring in part).  See *Longshoremen* v. *Allied International, Inc.*, 456 U. S. 212, 222–223, and n. 20 [(1982)]." 458 U. S., at 912.

FTC's petition to this Court. The Court of Appeals derived its exception from *United States* v. *O'Brien*, 391 U. S. 367 (1968). In that case O'Brien had burned his Selective Service registration certificate on the steps of the South Boston Courthouse. He did so before a sizable crowd and with the purpose of advocating his antiwar beliefs. We affirmed his conviction. We held that the governmental interest in regulating the "nonspeech element" of his conduct adequately justified the incidental restriction on First Amendment freedoms.[13] Specifically, we concluded that the statute's incidental restriction on O'Brien's freedom of expression was no greater than necessary to further the Government's interest in requiring registrants to have valid certificates continually available.

However, the Court of Appeals held that, in light of *O'Brien*, the expressive component of respondents' boycott compelled courts to apply the antitrust laws "prudently and with sensitivity," 272 U. S. App. D. C., at 279–280, 856 F. 2d, at 233–234, with a "special solicitude for the First Amendment rights" of respondents. The Court of Appeals concluded that the governmental interest in prohibiting boycotts is not sufficient to justify a restriction on the communicative element of the boycott unless the FTC can prove, and not merely presume, that the boycotters have market power. Because the Court of Appeals imposed this special requirement upon the government, it ruled that *per se* antitrust

---

[13] "This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. . . . [W]e think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U. S., at 376–377.

analysis was inapplicable to boycotts having an expressive component.

There are at least two critical flaws in the Court of Appeals' antitrust analysis: it exaggerates the significance of the expressive component in respondents' boycott and it denigrates the importance of the rule of law that respondents violated. Implicit in the conclusion of the Court of Appeals are unstated assumptions that most economic boycotts do not have an expressive component, and that the categorical prohibitions against price fixing and boycotts are merely rules of "administrative convenience" that do not serve any substantial governmental interest unless the price-fixing competitors actually possess market power.

It would not much matter to the outcome of this case if these flawed assumptions were sound. *O'Brien* would offer respondents no protection even if their boycott were uniquely expressive and even if the purpose of the *per se* rules were purely that of administrative efficiency. We have recognized that the government's interest in adhering to a uniform rule may sometimes satisfy the *O'Brien* test even if making an exception to the rule in a particular case might cause no serious damage. *United States* v. *Albertini*, 472 U. S. 675, 688 (1985) ("The First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important government interests"). The administrative efficiency interests in antitrust regulation are unusually compelling. The *per se* rules avoid "the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable." *Northern Pacific R. Co.* v. *United States*, 356 U. S. 1, 5 (1958). If small parties "were allowed to prove lack of market power, all parties would have that right, thus introducing the enormous complexities of market definition

into every price-fixing case." R. Bork, The Antitrust Paradox 269 (1978). For these reasons, it is at least possible that the *Claiborne Hardware* doctrine, which itself rests in part upon *O'Brien*,[14] exhausts *O'Brien*'s application to the anti-trust statutes.

In any event, however, we cannot accept the Court of Appeals' characterization of this boycott or the antitrust laws. Every concerted refusal to do business with a potential customer or supplier has an expressive component. At one level, the competitors must exchange their views about their objectives and the means of obtaining them. The most blatant, naked price-fixing agreement is a product of communication, but that is surely not a reason for viewing it with special solicitude. At another level, after the terms of the boycotters' demands have been agreed upon, they must be communicated to its target: "[W]e will not do business until you do what we ask." That expressive component of the boycott conducted by these respondents is surely not unique. On the contrary, it is the hallmark of every effective boycott.

At a third level, the boycotters may communicate with third parties to enlist public support for their objectives; to the extent that the boycott is newsworthy, it will facilitate the expression of the boycotters' ideas. But this level of expression is not an element of the boycott. Publicity may be generated by any other activity that is sufficiently newsworthy. Some activities, including the boycott here, may be newsworthy precisely for the reasons that they are prohibited: the harms they produce are matters of public concern. Certainly that is no reason for removing the prohibition.

In sum, there is thus nothing unique about the "expressive component" of respondents' boycott. A rule that requires courts to apply the antitrust laws "prudently and with sensitivity" whenever an economic boycott has an "expressive component" would create a gaping hole in the fabric of those

---

[14] See 458 U. S., at 912.

laws. Respondents' boycott thus has no special characteristics meriting an exemption from the *per se* rules of antitrust law.

Equally important is the second error implicit in respondents' claim to immunity from the *per se* rules. In its opinion, the Court of Appeals assumed that the antitrust laws permit, but do not require, the condemnation of price fixing and boycotts without proof of market power.[15] The opinion further assumed that the *per se* rule prohibiting such activity "is only a rule of 'administrative convenience and efficiency,' not a statutory command." 272 U. S. App. D. C., at 295, 856 F. 2d, at 249. This statement contains two errors. The *per se*

---

[15] In our opinion in *Jefferson Parish Hospital District No. 2* v. *Hyde*, 466 U. S. 2 (1984), we noted that "[t]he rationale for *per se* rules in part is to avoid a burdensome inquiry into actual market conditions in situations where the likelihood of anticompetitive conduct is so great as to render unjustified the costs of determining whether the particular case at bar involves anticompetitive conduct. See, *e. g.*, *Arizona* v. *Maricopa County Medical Society*, 457 U. S. 332, 350–351 (1982)." *Id.*, at 15–16, n. 25. The Court of Appeals overlooked the words "in part" in that footnote, and also overlooked the statement in text that "there must be a substantial potential for impact on competition in order to justify *per se* condemnation." *Id.*, at 16. As the following paragraph from its opinion demonstrates, the Court of Appeals incorrectly assumed that the *per se* rule against price fixing is "only" a rule of administrative convenience:

"The antitrust laws permit, but do not require, the condemnation of price fixing without proof of market power; even the *per se* rule, as the Commission acknowledges in its brief, is only a rule of 'administrative convenience and efficiency,' not a statutory command. FTC Brief at 39; see *Jefferson Parish Hospital Dist. No. 2* v. *Hyde*, 466 U. S. 2, 15 n. 25 (1984). While the rule may occasionally be overinclusive, condemning the ineffectual with the harmful, there is no known danger that socially beneficial arrangements will be prohibited, for price-fixing agreements rarely, if ever, have redeeming virtues. As for the hapless but harmless, as Professor Areeda has noted, defendants charged with conspiring to fix prices 'have little moral standing to demand proof of power or effect when the most they can say for themselves is that they tried to harm the public but were mistaken in their ability to do so.' VII P. Areeda, Antitrust Law ¶ 1509 at 411 (1986)." 272 U. S. App. D. C., at 295, 856 F. 2d, at 249.

rules are, of course, the product of judicial interpretations of the Sherman Act, but the rules nevertheless have the same force and effect as any other statutory commands. Moreover, while the *per se* rule against price fixing and boycotts is indeed justified in part by "administrative convenience," the Court of Appeals erred in describing the prohibition as justified only by such concerns. The *per se* rules also reflect a longstanding judgment that the prohibited practices by their nature have "a substantial potential for impact on competition." *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U. S. 2, 16 (1984).

As we explained in *Professional Engineers,* the rule of reason in antitrust law generates

> "two complementary categories of antitrust analysis. In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are 'illegal *per se*.' In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." 435 U. S., at 692.

"Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable." *Arizona v. Maricopa County Medical Society,* 457 U. S. 332, 344 (1982).

The *per se* rules in antitrust law serve purposes analogous to *per se* restrictions upon, for example, stunt flying in congested areas or speeding. Laws prohibiting stunt flying or setting speed limits are justified by the State's interest in protecting human life and property. Perhaps most violations of such rules actually cause no harm. No doubt many experienced drivers and pilots can operate much more safely, even at prohibited speeds, than the average citizen.

If the especially skilled drivers and pilots were to paint messages on their cars, or attach streamers to their planes, their conduct would have an expressive component. High speeds and unusual maneuvers would help to draw attention to their messages. Yet the laws may nonetheless be enforced against these skilled persons without proof that their conduct was actually harmful or dangerous.

In part, the justification for these *per se* rules is rooted in administrative convenience. They are also supported, however, by the observation that every speeder and every stunt pilot poses some threat to the community. An unpredictable event may overwhelm the skills of the best driver or pilot, even if the proposed course of action was entirely prudent when initiated. A bad driver going slowly may be more dangerous that a good driver going quickly, but a good driver who obeys the law is safer still.

So it is with boycotts and price fixing.[16] Every such horizontal arrangement among competitors poses some threat to the free market. A small participant in the market is, obviously, less likely to cause persistent damage than a large participant. Other participants in the market may act quickly and effectively to take the small participant's place. For reasons including market inertia and information failures, however, a small conspirator may be able to impede compe-

---

[16] "In sum, price-fixing cartels are condemned per se because the conduct is tempting to businessmen but very dangerous to society. The conceivable social benefits are few in principle, small in magnitude, speculative in occurrence, and always premised on the existence of price-fixing power which is likely to be exercised adversely to the public. Moreover, toleration implies a burden of continuous supervision for which the courts consider themselves ill-suited. And even if power is usually established while any defenses are not, litigation will be complicated, condemnation delayed, would be price-fixers encouraged to hope for escape, and criminal punishment less justified. Deterrence of a generally pernicious practice would be weakened. The key points are the first two. Without them, there is no justification for categorical condemnation." 7 P. Areeda, Antitrust Law ¶ 1509, pp. 412–413 (1986).

tition over some period of time.[17]   Given an appropriate set of circumstances and some luck, the period can be long enough to inflict real injury upon particular consumers or competitors.[18]

As Justice Douglas observed in an oft-quoted footnote to his *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150 (1940), opinion:

> "Price-fixing agreements may or may not be aimed at complete elimination of price competition.   The group making those agreements may or may not have power to control the market.   But the fact that the group cannot control the market prices does not necessarily mean that the agreement as to prices has no utility to the members of the combination.   The effectiveness of price-fixing agreements is dependent on many factors, such as competitive tactics, position in the industry, the formula underlying pricing policies.   Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness.   They are all banned because of their actual or potential threat to the central nervous system of the economy." *Id.*, at 225–226, n. 59.

See also *Maricopa County Medical Society*, 457 U. S., at 351, and n. 23.

Of course, some boycotts and some price-fixing agreements are more pernicious than others; some are only partly successful, and some may only succeed when they are buttressed by other causative factors, such as political influence.   But

---

[17] Cf. Markovits, The Limits to Simplifying Antitrust: A Reply to Professor Easterbrook, 63 Texas L. Rev. 41, 80 (1984) (suggesting circumstances in which a firm that lacks market power may nonetheless benefit from anticompetitive tactics).

[18] "Very few firms that lack power to affect market prices will be sufficiently foolish to enter into conspiracies to fix prices.   Thus, the fact of agreement defines the market." R. Bork, The Antitrust Paradox 269 (1978).

an assumption that, absent proof of market power, the boycott disclosed by this record was totally harmless—when overwhelming testimony demonstrated that it almost produced a crisis in the administration of criminal justice in the District and when it achieved its economic goal—is flatly inconsistent with the clear course of our antitrust jurisprudence. Conspirators need not achieve the dimensions of a monopoly, or even a degree of market power any greater than that already disclosed by this record, to warrant condemnation under the antitrust laws.

## VI

The judgment of the Court of Appeals is accordingly reversed insofar as that court held the *per se* rules inapplicable to the lawyers' boycott.[19] The case is remanded for further proceedings consistent with this opinion.[20]

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in part and dissenting in part.

The Court holds today that a boycott by the Superior Court Trial Lawyers Association (SCTLA or Trial Lawyers), whose members collectively refused to represent indigent

---

[19] In response to JUSTICE BRENNAN's opinion, and particularly to its observation that some concerted arrangements that might be characterized as "group boycotts" may not merit *per se* condemnation, see *post*, at 452, n. 9, we emphasize that this case involves not only a boycott but also a horizontal price-fixing arrangement—a type of conspiracy that has been consistently analyzed as a *per se* violation for many decades. All of the "group boycott" cases cited in JUSTICE BRENNAN's footnote involved nonprice restraints. There was likewise no price-fixing component in any of the boycotts listed on pages 447–448 of JUSTICE BRENNAN's opinion. Indeed, the text of the opinion virtually ignores the price-fixing component of respondents' concerted action.

[20] On remand, the Court of Appeals should review respondents' objections to the form of the order entered by the Commission. See 272 U. S. App. D. C., at 299, 856 F. 2d, at 253.

criminal defendants without greater compensation, constituted conduct that was neither clearly outside the scope of the Sherman Act nor automatically immunized from antitrust regulation by the First Amendment. With this much I agree.[1] In Part V of its opinion, however, the Court maintains that under the *per se* rule the Federal Trade Commission (FTC or Commission) could find the boycott illegal because it *might* have implicated some of the concerns underlying the antitrust laws. I cannot countenance this reasoning, which upon examination reduces to the Court's assertion that since the government may prohibit airplane stunt flying and reckless automobile driving as categorically harmful, see *ante,* at 433–434, it may also subject expressive political boycotts to a presumption of illegality without even inquiring as to whether they actually cause any of the harms that the antitrust laws are designed to prevent. This non sequitur cannot justify the significant restriction on First Amendment freedoms that the majority's rule entails. Because I believe that the majority's decision is insensitive to the venerable tradition of expressive boycotts as an important means of political communication, I respectfully dissent from Part V of the Court's opinion.

## I

The Petition and Free Speech Clauses of the First Amendment guarantee citizens the right to communicate with the government, and when a group persuades the government to adopt a particular policy through the force of its ideas and the power of its message, no antitrust liability can attach. "There are, of course, some activities, legal if engaged in by one, yet illegal if performed in concert with others, but political expression is not one of them." *Citizens Against Rent*

---

[1] I join Parts I, II, III, and IV of the Court's opinion, although, as discussed further *infra,* I do not agree that the unreasonableness of the preboycott rates of compensation and the fact that the Trial Lawyers enjoyed no other effective means of making themselves heard are irrelevant to the proper analysis. See *ante,* at 421–422.

*Control/Coalition for Fair Housing* v. *Berkeley*, 454 U. S. 290, 296 (1981). But a group's effort to use market power to coerce the government through economic means may subject the participants to antitrust liability.

In any particular case, it may be difficult to untangle these two effects by determining whether political or economic power was brought to bear on the government. The Court of Appeals thoughtfully analyzed this problem and concluded, I believe correctly, that there could be no antitrust violation absent a showing that the boycotters possessed some degree of market power—that is, the ability to raise prices profitably through economic means or, more generally, the capacity to act other than as would an actor in a perfectly competitive market. The court reasoned that "[w]hen the government seeks to regulate an economic boycott with an expressive component . . . . its condemnation without proof that the boycott could in fact be anticompetitive ignores the command of [*United States* v.] *O'Brien* that restrictions on activity protected by the First Amendment be '*no greater than is essential*' to preserve competition from the sclerotic effects of combination." 272 U. S. App. D. C. 272, 295, 856 F. 2d 226, 249 (1988) (quoting *United States* v. *O'Brien*, 391 U. S. 367, 377 (1968)) (emphasis in original). The concurring judge added that if the participants wielded no market power, "the boycott must have succeeded out of persuasion and been a political activity." 272 U. S. App. D. C., at 300, 856 F. 2d, at 254 (opinion of Silberman, J.). This approach is quite sensible, and I would affirm the Court of Appeals' decision to remand the case to the FTC for a showing of market power.

### A

The issue in this case is *not* whether boycotts may ever be punished under § 5 of the Federal Trade Commission Act, 15 U. S. C. § 45(a)(1), consistent with the First Amendment; rather, the issue is *how* the government may determine *which* boycotts are illegal. Two well-established premises

lead to the ineluctable conclusion that when applying the antitrust laws to a particular expressive boycott, the government may not presume an antitrust violation under the *per se* rule, but must instead apply the more searching, case-specific rule of reason.

First, the *per se* rule is a *presumption* of illegality.[2] As JUSTICE STEVENS has written:

"The costs of judging business practices under the rule of reason, however, have been reduced by the recognition of *per se* rules. Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable. *As in every rule of general application, the match between the presumed and the actual is imperfect. For the sake of business certainty and litigation efficiency,*

---

[2] I disagree with the Court that the government's interest in employing the *per se* rule here is a substantial one. The *per se* rule's conceded service of the goals of administrative efficiency and judicial economy cannot justify its application to activity protected by the First Amendment. "[T]he First Amendment does not permit the State to sacrifice speech for efficiency." *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781, 795 (1988). See also *Schneider* v. *State*, 308 U. S. 147, 161, 164 (1939). Insofar as the *per se* rule is thought warranted by a speculation that even relatively small boycotts or those without market power might nonetheless inflict some measure of economic harm, see *ante*, at 434–436, the rule can be applied in ordinary antitrust cases where First Amendment freedoms are not implicated. In such cases, "'[t]he conceivable social benefits [of the conduct under scrutiny] are few in principle, small in magnitude, [and] speculative in occurrence.'" *Ante*, at 434, n. 16 (quoting 7 P. Areeda, Antitrust Law ¶1509, pp. 412–413 (1986)). But where an expressive boycott is at issue, the same cannot be said; the First Amendment establishes that the social benefits involved are not "small in magnitude" or "speculative in occurrence." Hence, even if it were *possible* that a boycott without market power might cause anticompetitive effects—a dubious proposition, since by definition market power is the ability to alter prices— the government still should be required to proceed under the rule of reason and demonstrate that such effects are actually present in the case *sub judice.*

> *we have tolerated the invalidation of some agreements
> that a fullblown inquiry might have proved to be reason-
> able."* Arizona v. Maricopa County Medical Society,
> 457 U. S. 332, 343–344 (1982) (emphasis added; footnotes
> omitted).

We have freely admitted that conduct condemned under the *per se* rule sometimes would be permissible if subjected merely to rule-of-reason analysis. See *Maricopa, supra,* at 344, n. 16; *Continental T. V., Inc.* v. *GTE Sylvania Inc.,* 433 U. S. 36, 50, n. 16 (1977); *United States* v. *Topco Associates, Inc.,* 405 U. S. 596, 609 (1972).

Second, the government may not in a First Amendment case apply a broad presumption that certain categories of speech are harmful without engaging in a more particularized examination.[3] As the Court of Appeals perceptively rea-soned, "the evidentiary shortcut to antitrust condemnation without proof of market power is inappropriate as applied to a boycott that served, in part, to make a statement on a mat-ter of public debate." 272 U. S. App. D. C., at 296, 856 F. 2d, at 250. "Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals"; rather, govern-ment must ensure that, even when its regulation is not con-tent based, the restriction narrowly "focuses on the source of the evils the [State] seeks to eliminate." *Ward* v. *Rock Against Racism,* 491 U. S. 781, 799, and n. 7 (1989). This is

---

[3] In *United States* v. *O'Brien,* 391 U. S. 367 (1968), the Court held: "[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regu-lating the nonspeech element can justify incidental restrictions on First Amendment freedoms. . . . [W]e think it clear that a government regula-tion is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental inter-est; if the governmental interest is unrelated to the suppression of free ex-pression; and if the incidental restriction on alleged First Amendment free-doms is no greater than is essential to the furtherance of that interest." *Id.,* at 376–377.

what it means for a law to be "narrowly tailored" to the State's interest. See *Board of Trustees of State Univ. of N. Y.* v. *Fox*, 492 U. S. 469, 478 (1989); *Frisby* v. *Schultz*, 487 U. S. 474, 485 (1988). "Broad prophylactic rules in the area of free expression are suspect." *NAACP* v. *Button*, 371 U. S. 415, 438 (1963).

In *Speiser* v. *Randall*, 357 U. S. 513 (1958), for example, we invalidated a state program under which taxpayers applying for a certain tax exemption bore the burden of proving that they did not advocate the overthrow of the United States Government. We held that the presumption against the taxpayer was unconstitutional because the State had "no such compelling interest at stake as to justify a short-cut procedure which must inevitably result in suppressing protected speech." *Id.*, at 529. More recently, we determined that the First Amendment prohibits a State from imposing liability on a newspaper for the publication of embarrassing but truthful information based on a "negligence *per se*" theory. See *The Florida Star* v. *B. J. F.*, 491 U. S. 524 (1989). In language applicable to the instant case, we rejected "the broad sweep" of a standard where "liability follows automatically from publication," and we instead required "case-by-case findings" of harm. *Id.*, at 539. Similarly, I would hold in this case that the FTC cannot ignore the particular factual circumstances before it by employing a *presumption* of illegality in the guise of the *per se* rule.

## B

The Court's approach today is all the more inappropriate because the success of the Trial Lawyers' boycott could have been attributable to the persuasiveness of its message rather than any coercive economic force. When a boycott seeks to generate public support for the passage of legislation, it may operate on a *political* rather than *economic* level, especially when the government is the target. Here, the demand for lawyers' services under the Criminal Justice Act (CJA) is

created by the command of the Sixth Amendment. How that demand is satisfied is determined by the political decisions of the Mayor, city council, and, because of the unique status of the District of Columbia, the Federal Government as well. As the FTC recognized, see *In re Superior Court Trial Lawyers Assn.*, 107 F. T. C. 510, 572–574 (1986), a *typical* boycott functions by transforming its participants into a single monopolistic entity that restricts supply and increases price. See, *e. g., FTC* v. *Indiana Federation of Dentists*, 476 U. S. 447, 459 (1986); *National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Oklahoma*, 468 U. S. 85, 109–110 (1984).

The boycott in this case was completely different: it may have persuaded the consumer of the Trial Lawyers' services—the District government—to raise the price it paid by altering the *political* preferences of District officials. Prior to the boycott, these officials perceived that at a time of fiscal austerity, a pay raise for lawyers who represented criminal defendants was not likely to be well received by the voters, whatever the merits of the issue. The SCTLA campaign drew public attention to the lawyers' plight and generated enough sympathy among city residents to convince District officials, many of whom were already favorably inclined toward the Trial Lawyers' cause, that they could augment CJA compensation rates without risking their political futures. Applying the *per se* rule to such a complex situation ignores the possibility that the boycott achieved its goal through a politically driven increase in demand for improved quality of representation, rather than by a cartel-like restriction in supply. The Court of Appeals concluded that "it [was] . . . possible that, lacking any market power, [the Trial Lawyers] procured a rate increase by changing public attitudes through the publicity attending the boycott," 272 U. S. App. D. C., at 297, 856 F. 2d, at 251, or that "the publicity surrounding the boycott may have served . . . to dissipate any public opposition that a substantial raise for lawyers who represent indi-

gent defendants had previously encountered." *Ibid.*[4] The majority is able to reach the contrary conclusion only by disregarding the long history of attempts to raise defense lawyers' compensation levels in the District and the virtually unanimous support the Trial Lawyers enjoyed among members of the bar, the judiciary, and, indeed, officials of the city government.

As the Court appears to recognize, see *ante*, at 421, preboycott rates were unreasonably low. City officials hardly could have reached a different conclusion. After 1970, the CJA set fees at $30 per hour for court time and $20 per hour for out-of-court time, and, despite a 147 percent increase in the Consumer Price Index, compensation remained at those levels until the boycott in 1983. Calculated in terms of 1970 dollars, at the time of the boycott CJA lawyers earned approximately $7.80 per hour for out-of-court time and $11.70 for in-court time. In contrast, in 1983 the typical billing rate for private attorneys in major metropolitan areas with 11 to 20 years of experience was $123 per hour, and the rate for those with less than two years of experience was $64 per hour. See App. in No. 86–1465 (CADC), pp. 678–679, 807. Even attorneys receiving compensation under the Equal Access to Justice Act, 28 U. S. C. § 2412(d)(2)(A)(ii) (1982 ed.), obtained fees of $75 per hour, with the possibility of upward adjustments to still larger sums. The Chairperson of the Judicial Conference Committee to Implement the Criminal Justice Act testified before Congress that "generally, the present Criminal Justice Act compensation rates do not even

---

[4] The Court quotes the finding of the FTC Administrative Law Judge (ALJ) that there was no evidence that the District government's decision to raise CJA compensation rates responded to the Trial Lawyers' campaign or to public pressure generally. See *ante*, at 416–417. The majority, however, conveniently omits the Court of Appeals' answer to this finding by the ALJ: "[T]he Commission did not reach the question and rejected the ALJ's findings except insofar as it expressly adopted them." 272 U. S. App. D. C., at 297, 856 F. 2d, at 251. By implication, therefore, the Commission rejected the trial examiner's finding on this point.

cover the appointed attorney's office overhead expenses related to time devoted to representation of defendants under the Act." Criminal Justice Act: Hearings on H. R. 3233 before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 98th Cong., 1st Sess., 22 (1983) (statement of Hon. Thomas J. MacBride). David B. Isbell, then District of Columbia Bar president, warned that "unrealistic and unreasonable compensation rates have hampered the D. C. CJA program in attracting and retaining significant numbers of qualified criminal defense counsel." *Id.*, at 306.

The legal community became concerned about the low level of CJA fees as early as 1975. The Report on the Criminal Defense Services in the District of Columbia by the Joint Committee of the Judicial Conference of the District of Columbia Circuit and the District of Columbia Bar (Austern-Rezneck Report) concluded that the prevailing rates "drove talented attorneys out of CJA practice, and encouraged those who remained to do a less than adequate job on their cases." 272 U. S. App. D. C., at 275, 856 F. 2d, at 229. The Austern-Rezneck Report recommended that CJA lawyers be paid $40 per hour for time spent in or out of court, subject to a ceiling of $800 for a misdemeanor case and $1,000 for a felony case. The Report characterized this increase as "'the absolute minimum necessary to attract and hold good criminal lawyers and assure their ability to render effective representation to their clients.'" *Ibid.* (quoting Austern-Rezneck Report 84).

In March 1982, the District of Columbia Court System Study Committee of the District of Columbia Bar issued the Horsky Report, which recommended the identical pay increase. See Senate Committee on Governmental Affairs, Senate Print No. 98–34, 98th Cong., 1st Sess. 69 (1983). Legislation increasing the hourly rate to $50 was then introduced in the District of Columbia Council, but the bill died in committee in 1982 without a hearing.

In September 1982, SCTLA officials began a lobbying effort to increase CJA compensation levels. They met with Chief Judge Moultrie of the District of Columbia Superior Court, Herbert Reid, who was counsel to the Mayor, and Wiley Branton, then Dean of Howard University Law School. Chief Judge Moultrie told SCTLA representatives that he thought they deserved more money, but he declined to provide them any public support on the ground that if an increase were implemented, his court might be called upon to decide its legality. See 272 U. S. App. D. C., at 275, 856 F. 2d, at 229. Reid informed them that the Mayor was sympathetic to their cause but would not support legislation without the urging of Chief Judge Moultrie. Dean Branton advised that the SCTLA should do "'something dramatic to attract attention in order to get any relief.'" *Ibid.*

In March 1983, District of Columbia Council Chairman David Clarke introduced a new, less ambitious bill increasing CJA lawyers' pay to $35 per hour. A wide variety of groups testified in favor of the bill at a hearing held by the city council's Judiciary Committee, reflecting an overwhelming consensus on the need to increase CJA rates.[5] No one testified against the bill, though the Executive Office of the District of Columbia Courts worried about how to fund it. The Court of Appeals concluded that "Mayor Barry and other important city officials were sympathetic to the boycotters' goals and may even have been supportive of the boycott itself," *id.*, at 297, n. 35, 856 F. 2d, at 251, n. 35, and that certain statements by the Mayor could be interpreted "as encouraging the [Trial Lawyers] to stage a demonstration of their political

---

[5] Groups testifying in favor of the bill included the SCTLA, District of Columbia Bar, D. C. Chapter of the National Lawyers Guild, Public Defender Service, D. C. Chapter of the Washington Psychiatric Society, Family Law Association, National Capitol Area Chapter of the American Civil Liberties Union, and National Center of Institutional Alternatives. See App. in No. 86–1465 (CADC), pp. 800–801.

muscle so that a rate increase could more easily be justified to the public." *Id.*, at 298, n. 35, 856 F. 2d, at 252, n. 35.

Taken together, these facts strongly suggest that the Trial Lawyers' campaign persuaded the city to increase CJA compensation levels by creating a favorable climate in which supportive District officials could vote for a raise without public opposition, even though the lawyers lacked the ability to exert economic pressure. As the court below expressly found, the facts at the very least do not exclude the possibility that the SCTLA succeeded due to political rather than economic power. See *id.*, at 297, 856 F. 2d, at 251. The majority today permits the FTC to find an expressive boycott to violate the antitrust laws, without even requiring a showing that the participants possessed market power or that their conduct triggered any anticompetitive effects. I believe that the First Amendment forecloses such an approach.

## II

### A

The majority concludes that the Trial Lawyers' boycott may be enjoined without any showing of market power because "the government's interest in adhering to a uniform rule may *sometimes* satisfy the *O'Brien* test even if making an exception to the rule in a particular case might cause no serious damage." *Ante*, at 430 (citing *United States* v. *Albertini*, 472 U. S. 675 (1985)) (emphasis added). The Court draws an analogy between the *per se* rule in antitrust law and categorical proscriptions against airplane stunt flying and reckless automobile driving. See *ante*, at 433–434. This analogy is flawed.

It is beyond peradventure that *sometimes* no exception need be made to a neutral rule of general applicability not aimed at the content of speech; "the arrest of a newscaster for a traffic violation," for example, does not offend the First Amendment. *Arcara* v. *Cloud Books, Inc.*, 478 U. S. 697, 708 (1986) (O'CONNOR, J., concurring). Neither do restric-

tions on stunt flying and reckless driving usually raise First Amendment concerns.[6] But ever since *Schneider* v. *State,* 308 U. S. 147 (1939), we have held that even when the government seeks to address harms entirely unconnected with the content of speech, it must leave open ample alternative channels for effective communication. See *Rock Against Racism,* 491 U. S., at 802–803; *Frisby,* 487 U. S., at 483–484; *Clark* v. *Community for Creative Non-Violence,* 468 U. S. 288, 293 (1984); *Metromedia, Inc.* v. *San Diego,* 453 U. S. 490, 552 (1981) (STEVENS, J., dissenting in part); *Heffron* v. *International Society for Krishna Consciousness, Inc.,* 452 U. S. 640, 648 (1981). Although *sometimes* such content-neutral regulations with incidental effects on speech leave open sufficient room for effective communication, application of the *per se* rule to expressive boycotts does not. The role of boycotts in political speech is too central, and the effective alternative avenues open to the Trial Lawyers were too few, to permit the FTC to invoke the *per se* rule in this case.

Expressive boycotts have been a principal means of political communication since the birth of the Republic. As the Court of Appeals recognized, "boycotts have historically been used as a dramatic means of communicating anger or disapproval and of mobilizing sympathy for the boycotters' cause." 272 U. S. App. D. C., at 294, 856 F. 2d, at 248. From the colonists' protest of the Stamp and Townsend Acts to the Montgomery bus boycott and the National Organization for Women's campaign to encourage ratification of the Equal Rights Amendment, boycotts have played a central role in our Nation's political discourse. In recent years there have

---

[6] Even the criminal law, however, provides procedural safeguards to ensure that laws are not applied in an overbroad fashion to punish activity protected by the First Amendment. The defendant in a criminal trial is always able to raise the defense that the law is unconstitutional as applied to him. See, *e. g., Texas* v. *Johnson,* 491 U. S. 397 (1989). Application of the *per se* rule in the instant case denies the Trial Lawyers even this opportunity.

been boycotts of supermarkets, meat, grapes, iced tea in cans, soft drinks, lettuce, chocolate, tuna, plastic wrap, textiles, slacks, animal skins and furs, and products of Mexico, Japan, South Africa, and the Soviet Union. See *Missouri* v. *National Organization for Women, Inc.*, 620 F. 2d 1301, 1304, n. 5 (CA8), cert. denied, 449 U. S. 842 (1980); Note, 80 Colum. L. Rev. 1317, 1318, 1334 (1980). Like soapbox oratory in the streets and parks, political boycotts are a traditional means of "communicating thoughts between citizens" and "discussing public questions." *Hague* v. *Committee for Industrial Organization*, 307 U. S. 496, 515 (1939) (opinion of Roberts, J.). Any restrictions on such boycotts must be scrutinized with special care in light of their historic importance as a mode of expression. Cf. *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45 (1983).

The Court observes that all boycotts have "an expressive component" in the sense that participants must communicate their plans among themselves and to their target. *Ante,* at 431. The Court reasons that this expressive feature alone does not render boycotts immune from scrutiny under the *per se* rule. Otherwise, the rule could never be applied to any boycotts or to most price-fixing schemes. On this point I concur with the majority. But while some boycotts may not present First Amendment concerns, when a particular boycott appears to operate on a political rather than economic level, I believe that it cannot be condemned under the *per se* rule.[7] The Court disagrees and maintains that communica-

---

[7] If a boycott uses economic power in an unlawful way to send a message, it cannot claim First Amendment protection from the antitrust laws, any more than a terrorist could use an act of violence to express his political views and then assert immunity from criminal prosecution. Thus, if a cartel in a regulated industry inflicts economic injury on consumers by raising prices in order to communicate with the government, it still would be subject to the *per se* rule. The instant case is different: there is a genuine question whether the SCTLA boycott involved *any* economic coercion at all. That is why a showing of market power is necessary before the boycott can be condemned as an unfair method of competition.

tion of ideas to the public is a function not of a boycott itself but rather of media coverage, interviews, and other activities ancillary to the boycott and not prohibited by the antitrust laws. See *ante*, at 426. The Court also notes that other avenues of speech are open, because "[p]ublicity may be generated by any other activity that is sufficiently newsworthy." *Ante*, at 431. These views are flawed.

First, we have already recognized that an expressive boycott necessarily involves "constitutionally protected activity." *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 911 (1982). That case, in which we held that a civil rights boycott was political expression, forecloses the Court's approach today. In *Claiborne Hardware*, JUSTICE STEVENS observed that "[t]he established elements of speech, assembly, association, and petition, 'though not identical, are inseparable'" when combined in an expressive boycott. *Ibid.* (citation omitted). I am surprised that he now finds that the Trial Lawyers' boycott was not protected speech. In this case, as in *Claiborne Hardware*, "[t]hrough the exercise of the[ir] First Amendment rights, petitioners sought to bring about political, social, and economic change." *Ibid.* The Court contends that the SCTLA's motivation differed from that of the boycotters in *Claiborne Hardware*, see *ante*, at 426–427, because the former sought to supplement its members' own salaries rather than to remedy racial injustice. Even if true, the different *purposes* of the speech can hardly render the Trial Lawyers' boycott any less *expressive*.

Next, although the Court is correct that the media coverage of the boycott was substantial,[8] see *ante*, at 414, this

---

[8] The lawyers actively courted press coverage of their strike. They set up "picket lines," distributed press kits, and granted interviews; the media, both local and national, responded. No fewer than 19 newspaper articles regarding the boycott appeared in the Washington Post, Washington Times, USA Today, and New York Times. The Washington Post's editorial page endorsed the boycott, opining that "[i]t is simply unfair that these fees have remained unchanged during a period when median income in the area has risen over 180 percent." Washington Post, Sept. 8, 1983,

does not support the majority's argument that the boycott itself was not expressive. Indeed, that the SCTLA strove so mightily to communicate with the public and the government is an indication that it relied more on its ability to win public sympathy and persuade government officials politically than on its power to coerce the city economically. But media coverage is not the only, or even the principal, reason why the boycott was entitled to First Amendment protection. The refusal of the Trial Lawyers to accept appointments by itself communicated a powerful idea: CJA compensation rates had deteriorated so much, relatively speaking, that the lawyers were willing to forgo their livelihoods rather than return to work.

By sacrificing income that they actually desired, and thus inflicting hardship on themselves as well as on the city, the lawyers demonstrated the intensity of their feelings and the depth of their commitment. The passive nonviolence of King and Gandhi are proof that the resolute acceptance of pain may communicate dedication and righteousness more eloquently than mere words ever could. A boycott, like a hunger strike, conveys an emotional message that is absent in a letter to the editor, a conversation with the mayor, or even a protest march. Cf. *Cohen* v. *California,* 403 U. S. 15, 26 (1971) (First Amendment protects "not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well"). In this respect, an expressive

---

p. A20, col. 1. The New York Times reported that "[t]he unusual thing about the lawyer's . . . job action is that almost no one disagrees with their argument." N. Y. Times, Sept. 1, 1983, p. B10, col. 3. United States District Judge Harold H. Greene wrote that the Trial Lawyers "should receive the modest increase they have requested." Washington Post, Sept. 12, 1983, p. A13, col. 2. Even the Economist of London carried a story on the boycott. Sept. 17, 1983, p. 25. Nor was coverage limited to the print media. Local television and radio stations aired numerous reports of the boycott, and an account of the Trial Lawyers' plight appeared on the CBS Morning News. See App. in No. 86-1465 (CADC), pp. 921, 923, 925, 937, 949.

boycott is a special form of political communication. Dean Branton's advice to the Trial Lawyers—that they should do "something dramatic to attract attention"—was sage indeed.

Another reason why expressive boycotts are irreplaceable as a means of communication is that they are essential to the "poorly financed causes of little people." *Martin* v. *Struthers*, 319 U. S. 141, 146 (1943). It is no accident that boycotts have been used by the American colonists to throw off the British yoke and by the oppressed to assert their civil rights. See *Claiborne Hardware, supra.* Such groups cannot use established organizational techniques to advance their political interests, and boycotts are often the only effective route available to them.

B

Underlying the majority opinion are apprehensions that the Trial Lawyers' boycott was really no different from any other, and that requiring the FTC to apply a rule-of-reason analysis in this case will lead to the demise of the *per se* rule in the boycott area. I do not share the majority's fears. The boycott before us today is readily distinguishable from those with which the antitrust laws are concerned, on the very ground suggested by the majority: the Trial Lawyers intended to and in fact did "communicate with third parties to enlist public support for their objectives." *Ante,* at 431. As we have seen, in all likelihood the boycott succeeded not due to any market power wielded by the lawyers but rather because they were able to persuade the District government through political means. Other boycotts may involve no expressive features and instead operate solely on an economic level. Very few economically coercive boycotts seek notoriety both because they seek to escape detection and because they have no wider audience beyond the participants and the target.

Furthermore, as the Court of Appeals noted, there may be significant differences between boycotts aimed at the government and those aimed at private parties. See 272 U. S.

App. D. C., at 296, 856 F. 2d, at 250. The government has options open to it that private parties do not; in this suit, for example, the boycott was aimed at a legislative body with the power to terminate it at any time by requiring all members of the District Bar to represent defendants *pro bono.* If a boycott against the government achieves its goal, it likely owes its success to political rather than market power.

The Court's concern for the vitality of the *per se* rule, moreover, is misplaced, in light of the fact that we have been willing to apply rule-of-reason analysis in a growing number of group-boycott cases. See, *e. g., Indiana Federation of Dentists,* 476 U. S., at 458–459; *Northwest Wholesale Stationers, Inc.* v. *Pacific Stationery & Printing Co.,* 472 U. S. 284, 293–298 (1985); *National Collegiate Athletic Assn.,* 468 U. S., at 101; *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.,* 441 U. S. 1, 9–10 (1979) (criticizing application of *per se* rule because "[l]iteralness is overly simplistic and often overbroad").[9] We have recognized that "there is

---

[9] Although "group boycotts" often are listed among the types of activity meriting *per se* condemnation, see, *e. g., Silver* v. *New York Stock Exchange,* 373 U. S. 341, 348 (1963); *White Motor Co.* v. *United States,* 372 U. S. 253, 259–260 (1963); *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.,* 359 U. S. 207, 212 (1959); *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 5 (1958); *Associated Press* v. *United States,* 326 U. S. 1, 12 (1945); *Fashion Originators' Guild of America, Inc.* v. *FTC,* 312 U. S. 457, 465–468 (1941), we have recognized that boycotts "'are not a unitary phenomenon.'" *St. Paul Fire & Marine Ins. Co.* v. *Barry,* 438 U. S. 531, 543 (1978). In fact, "'there is more confusion about the scope and operation of the *per se* rule against group boycotts than in reference to any other aspect of the *per se* doctrine.'" *Northwest Wholesale Stationers, Inc.* v. *Pacific Stationery & Printing Co.,* 472 U. S., at 294 (quoting L. Sullivan, Law of Antitrust 229–230 (1977)). We have observed that "the category of restraints classed as group boycotts is not to be expanded indiscriminately, and the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *FTC* v. *Indiana Federation of Dentists,* 476 U. S., at 458. These considerations provide additional reason to analyze the instant case with great care, because the Trial Lawyers' boycott is certainly *sui generis.*

often no bright line separating *per se* from Rule of Reason analysis. *Per se* rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct." *National Collegiate Athletic Assn., supra,* at 104, n. 26.

In short, the conclusion that *per se* analysis is inappropriate in this boycott case would not preclude its application in many others, nor would it create insurmountable difficulties for antitrust enforcement. The plainly expressive nature of the Trial Lawyers' campaign distinguishes it from boycotts that are the intended subjects of the antitrust laws.

I respectfully dissent.

JUSTICE BLACKMUN, concurring in part and dissenting in part.

Like JUSTICE BRENNAN, I, too, join Parts I, II, III, and IV of the Court's opinion. But, while I agree with the reasoning of JUSTICE BRENNAN's dissent, I write separately to express my doubt whether a remand for findings of fact concerning the market power of the Superior Court Trial Lawyers Association (SCTLA or Trial Lawyers) would be warranted in the unique circumstances of this litigation. As JUSTICE BRENNAN notes, the Trial Lawyers' boycott was aimed at the District's courts and legislature, governmental bodies that had the power to terminate the boycott at any time by requiring any or all members of the District Bar— including the members of SCTLA—to represent indigent defendants *pro bono.* Attorneys are not merely participants in a competitive market for legal services; they are officers of the court. Their duty to serve the public by representing indigent defendants is not only a matter of conscience, but is also enforceable by the government's power to order such representation, either as a condition of practicing law in the District or on pain of contempt. See *Powell* v. *Alabama,* 287 U. S. 45, 73 (1932) ("Attorneys are officers of the court, and are bound to render service when required" by court appointment); see also *United States* v. *Accetturo,* 842 F. 2d

1408, 1412–1413 (CA3 1988); *Waters* v. *Kemp*, 845 F. 2d 260, 263 (CA11 1988).*

The Trial Lawyers' boycott thus was a dramatic gesture not fortified by any real economic power. They *could not* have coerced the District to meet their demands by brute economic force, *i. e.*, by constricting the supply of legal services to drive up the price. Instead, the Trial Lawyers' boycott put the government in a position where it had to make a political choice between exercising its power to break the boycott or agreeing to a rate increase. The factors relevant to this choice were political, not economic: that forcing the lawyers to stop the boycott would have been unpopular, because, as it turned out, public opinion supported the boycott; and that the District officials themselves may not have genuinely opposed the rate increase, and may have welcomed the appearance of a politically expedient "emergency."

I believe that, in this unique market where the government buys services that it could readily compel the sellers to provide, the Trial Lawyers lacked any market power and their boycott could have succeeded only through political persuasion. I therefore would affirm the judgment below insofar as it invokes the *United States* v. *O'Brien*, 391 U. S. 367 (1968), analysis to preclude application of the *per se* rule to the Trial Lawyers' boycott, but reverse as to the remand to the FTC for a determination of market power.

---

*This Court's recent decision in *Mallard* v. *United States District Court for Southern Dist. of Iowa*, 490 U. S. 296 (1989), is not to the contrary. In that case, the Court held that a particular federal statute, 28 U. S. C. § 1915(d), authorizing the District Court to "request" that an attorney represent an indigent litigant, does not give the court power to require an unwilling attorney to serve. The Court expressed no opinion on "whether the federal courts possess inherent authority to require lawyers to serve." 490 U. S., at 310. Indeed, by way of background, the Court discussed numerous state and federal statutes that *do* empower the courts to compel attorneys to serve. *Id.*, at 302–308.