February 25, 1993
UNITED STATES COURT OF APPEALS
For The First Circuit

No. 92-1856

SANDY RIVER NURSING CARE, ET AL.,

Plaintiffs, Appellants,

v.

AETNA CASUALTY, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Morton A. Brody, U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Stahl, Circuit Judge.

K. Craig Wildfang with whom Wood R. Foster, Jr., Anne K.

Weinhardt, Sidney St. F. Thaxter, John D. Gleason, Vance K. Opperman,

Robert J. Schmit, Patrick N. McTeague, and Barnet D. Skolnik were on

brief for appellants.
Richard G. Parker with whom Paul W. Chaiken, James E. Kaplan,

Mark F. Horning, Paul Macri, Fredric W. Yerman, Lewis V. Vafiades,

Michael L. McCluggage, Harold J. Friedman, Carl F. Rella, Stanley B.

Block, Robert S. Frank, Robert F. Hanson, William A. Montgomery,

Michael A. Nelson, James van R. Springer, George Z. Singal, Joseph E.

Coughlin, Paul H. Friedman, Randall B. Weill, Alfred C. Frawley, Peter

J. Rubin, Lewis V. Vafiades, and Lewis A. Noonberg were on brief for

appellees.
Stephen L. Wessler, Deputy Attorney General, Francis E. Ackerman,

Assistant Attorney General, and Thomas D. Warren, Deputy Attorney

General, on brief for the State of Maine, amicus curiae.

February 25, 1993

COFFIN, Senior Circuit Judge. Plaintiffs are a group of

Maine employers who claim that the defendant insurance companies

illegally conspired to fix prices and conduct a boycott in a

successful effort to coerce the state legislature into permitting

higher rates for workers' compensation insurance.1 The district

court granted summary judgment for defendants based on the

doctrines established in Parker v. Brown, 317 U.S. 341 (1943),

and Eastern R.R. Presidents Conference v. Noerr Motor Freight,

365 U.S. 127 (1961).2 The court concluded that plaintiffs'

claimed damage -- the additional cost of their insurance -- was

attributable to the legislation rather than to the alleged

conspiracy, and that, consequently, federal antitrust laws

provide no relief.

On appeal, plaintiffs contend that the court erred both in

construing their claims and in immunizing defendants' actions.

After carefully reviewing the record and pertinent caselaw, we

conclude that the district court properly granted summary

judgment for defendants. Although we depart somewhat from the

court's analysis -- finding that the alleged conspiracy

constituted a per se violation of the Sherman Act, 15 U.S.C. 1

1 Plaintiffs sued fifteen insurance companies and the
National Council on Compensation Insurance (NCCI), a voluntary
association of insurers that is a state-licensed rating
organization.

2 In briefest summary, these doctrines exempt from antitrust
liability anticompetitive actions attributable to the state,
Parker, 317 U.S. at 350-52, and political activity by individuals

seeking to influence the passage or enforcement of laws, Noerr,

365 U.S. at 136-40.

-- we affirm the court's holding that the Parker doctrine bars

plaintiffs' requested relief.3

I.4

Workers' compensation insurance has long been an extremely

sensitive issue in Maine. Regulation is strict. All employers

who do not self-insure are required to purchase such insurance.

Insurers are "required by Maine Law to charge only those rates

for workers' compensation insurance which have been filed with,

and approved by, the Maine Superintendent of Insurance in

conformance with Maine Law." Complt. 32. The businesses and

the insurers both have been dissatisfied with the system.

At least since 1981, NCCI and its members have taken

affirmative steps to challenge the allowable rates as unfairly

low. They have sought review of the Superintendent's rate

decisions in court, see, e.g., National Council on Compensation

Ins. v. Superintendent of Ins., 481 A.2d 775 (Me. 1984)

(affirming Superintendent's disapproval of a requested rate

increase of 27.5%; NCCI had claimed that statistical evidence

showed that a 110% increase was warranted), and consistently have

lobbied for legislation that would reduce statutory benefits and

permit insurers to charge higher rates. Neither their litigation

3 The complaint sought injunctive relief in addition to
damages, but neither the district court nor the parties devoted
attention to this request. We note only that, in light of our
analysis, we see no basis upon which plaintiffs may be awarded
injunctive relief.

4 We draw heavily from the district court's well-stated
description of the recent history of the Maine workers'
compensation system.

-3-

nor lobbying proved successful during the period relevant to this

litigation.

Indeed, to the contrary, the Maine legislature in 1985

enacted the "Workers' Compensation Competitive Rating Act," which

directed that workers' compensation insurance rates be rolled

back at least 8% and frozen at that level until 1987. Me. Rev.

Stat. Ann. tit. 24-A, 2331-2357 (1985) (repealed). Under the

Act, insurers were prohibited from requesting rate increases

exceeding 10% in 1987, 1988 and 1989. Id. at 2355. In

addition, the 1985 Act declared that it was intended, inter alia:

1. . . . To prohibit price fixing agreements and other
anticompetitive behavior by insurers.
. . .
3. . . . To promote price competition among insurers .
. . .

Id. at 2332.

The insurers challenged the 1985 act in court. Although the

Maine Superior Court determined that the rate ceilings were so

low that they were confiscatory, the court held that the ceilings

were not unconstitutional because insurers were free to withdraw

from the market for workers' compensation insurance in Maine.

National Council on Compensation Ins. v. Superintendent of Ins.,

CV-85-459 (Sup. Ct. May 14, 1987) (Alexander, J.), appeal

dismissed, 538 A.2d 759 (Me. 1988) (dismissed as moot because

1987 legislation repealed 1985 Act).

In this lawsuit, plaintiffs assert that defendants, unable

to achieve their goals legally, resorted to improper means.

Plaintiffs contend that defendants allegedly conspired to fix

-4-

prices at a higher-than-lawful rate and to conduct a boycott of

the Maine workers' compensation market to induce legislation

authorizing rate increases. As early as 1986, plaintiffs claim,

defendants jointly began refusing to insure employers

voluntarily, requiring them to obtain workers' compensation

coverage through the "residual" or "involuntary" system. Every

insurer authorized to write workers' compensation policies in

Maine is required by state law to participate in the "involuntary

market" and, thus, to share the underwriting responsibility for

employers otherwise unable to obtain coverage.5 The

conspirators allegedly increased the pressure on the Maine

legislature to act when, between late summer and October 1987,

virtually all workers' compensation insurers in Maine prepared to

withdraw from the state.

To avert the crisis that would occur if all workers'

compensation insurers left, Governor John McKernan convened a

special session of the legislature devoted exclusively to

reviewing and reforming Maine's workers' compensation system. In

short order, the legislature approved the "Workers' Compensation

Rating Act" (deleting the word "competitive" that had been in the

title of the 1985 Act), Me. Rev. St. Ann. tit. 24-A, 2361-2374

(West 1990 and 1992 Supp.). The 1987 Act removed the limitations

on rate increases contained in the 1985 Act. It authorized NCCI

to act as agent for its member insurance companies by submitting

5 Plaintiffs seem to suggest that the shift of employers
from the voluntary to the involuntary market was in some way
detrimental to them, but they do not explain how.

-5-

joint rate proposals on their behalf to the Superintendent of

Insurance, who is the ultimate decisionmaker on the rates

insurers may charge. Insurers are permitted, however, to deviate

below the rate approved by the Superintendent.

In 1988, 1989 and 1990, the insurers collectively applied

for rates beyond the limits allowed in the 1985 Act. Each year,

the Superintendent rejected the requested rate increases, but

authorized lower increases that still exceeded the 10% caps set

by the 1985 legislation. Plaintiffs contend that, as part of the

insurers' continuing price-fixing conspiracy, defendants

unlawfully agreed to charge only the maximum rates allowed by the

Superintendent.

Through this lawsuit, plaintiffs seek recovery of damages in

the amount of the increased premiums they have paid since the

1987 Act was passed and defendants began charging higher rates.

The district court concluded that this relief was barred because

the alleged harm was directly traceable to the 1987 legislation

and the approval of rate increases by the Maine Superintendent of

Insurance. The court relied on the well-established Parker

principle, see 317 U.S. at 350-52, that injury caused by

anticompetitive state action is not compensable under the

antitrust laws. The court further believed that defendants'

actions were protected by the Noerr doctrine, see 365 U.S. at

136-40, which exempts from antitrust liability the collective

efforts of private actors to promote anticompetitive legislation.

-6-

Plaintiffs argue on appeal that the district court erred

because it mistakenly attributed their asserted injury to state

action. They contend that they were harmed not by the

legislation itself but by defendants' ongoing conspiracy to

obtain and charge higher rates. Parker, they insist, is

therefore inapplicable. They further assert that Noerr provides

no immunity for defendants because the alleged conspiracy

involved classic anticompetitive economic conduct -- a boycott

and price-fixing -- rather than political activity such as

lobbying or petitioning.

Defendants respond that, regardless of the nature of the

conspiracy, which they admitted solely for purposes of the

summary judgment proceedings, they cannot be assessed damages

based on the premium increases authorized by state law. Because

that is the only injury for which plaintiffs seek relief,

defendants maintain that the district court correctly granted

summary judgment.

II.

The issues we face on this appeal are matters of law, and

our standard of review is therefore de novo. Liberty Mutual Ins.

Co. v. Commercial Union Ins. Co., 978 F.2d 750, 757 (1st Cir.

1992). Although plaintiffs repeated at oral argument a complaint

earlier made to the district court that they had had inadequate

time to develop the facts through discovery, we do not see how

additional investigation could have affected the summary judgment

decision. Defendants have admitted, for purposes of their

-7-

motion, that they conspired to withdraw from the Maine workers'

compensation market. Plaintiffs identify no other possibly

discoverable fact that would be material to the legal issues

before us. We note, moreover, that they have not appealed the

district court's denial of their motion for additional discovery

time.

Plaintiffs make a related claim that the district court

erred in repeatedly failing to construe their complaint in the

light most favorable to them, arguing that this standard of

scrutiny -- normally applicable to motions to dismiss -- applies

here because defendants conceded the material factual allegations

of the complaint. This claim also is irrelevant to our

disposition. As our analysis in the following sections will

demonstrate, plaintiffs' appeal fails no matter how liberally

their allegations concerning defendants' conspiracy are construed

because the specific relief they seek is barred as a matter of

law.

III.

We begin our analysis with an aspect of the case that has

engendered some confusion, but apparently no real disagreement

among the parties. In the concluding paragraph of its opinion,

the district court stated that "[t]he defendants' conspiracy to

press for legislation permitting them to charge higher rates --

which in and of itself caused Plaintiffs no injury -- is immune

under Noerr." Opinion at 22. The State of Maine construed this

statement and similar references elsewhere in the opinion as

-8-

holding that private actors lawfully may employ a concerted

economic boycott to influence a legislative determination.

Disturbed by this specific holding, the State sought and was

granted permission to file an amicus brief limited to urging that

we reverse the ruling.

We have some doubt that the district court intended the

broad statement attributed to it by the State. Regardless, at

this point, the State's position meets with no opposition from

any party. Plaintiffs and defendants all agree that private

actors who conduct an economic boycott violate the Sherman Act

and may be held responsible for direct marketplace injury caused

by the boycott, even if the boycotters' ultimate goal is to

obtain favorable state action. This view, we find, clearly

reflects Supreme Court precedent.

In Noerr, the Supreme Court held that the defendant

railroads could associate for the purpose of waging a publicity

campaign designed to secure legislative action harmful to the

truckers with whom they competed, without implicating the Sherman

Act prohibition against combinations in restraint of trade. 365

U.S. at 136-37. The Court observed that, in a representative

democracy, individuals must have the ability to "freely inform

the government of their wishes," id. at 137, and they are

permitted to do so even if their motives are entirely

anticompetitive, id. at 139-40. Any other conclusion "would

impute to the Sherman Act a purpose to regulate, not business

activity, but political activity, a purpose which would have no

-9-

basis whatever in the legislative history of the Act." Id. at

137.

Noerr does not protect from antitrust liability, however,

all actions designed to influence government. The Court has made

it clear that certain "combinations normally held violative of

the Sherman Act," id. at 136, including price-fixing agreements

and boycotts, are not "outside the coverage of the . . . Act

simply because [their] objective was the enactment of favorable

legislation," FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S.

411, 424 (1990). See also Allied Tube & Conduit Corp. v. Indian

Head, Inc., 486 U.S. 492, 503-04 (1988); Noerr, 365 U.S. at 136.

In other words, a classic economic restraint of trade is

actionable even if its primary purpose is political.

This limitation on the Noerr doctrine was fully explored in

Trial Lawyers, a case closely analogous to the one before us.

Trial Lawyers involved a boycott organized by members of the

District of Columbia criminal defense bar. The attorneys agreed

not to accept any court appointments to represent indigent

criminal defendants in order to force the District's City Council

to raise the hourly rate of pay for court-appointed criminal

defense work. The Supreme Court held that the boycott

constituted a "plain violation of the antitrust laws," 493 U.S.

at 428, and that "[o]ur decision in Noerr in no way detracts from

this conclusion," id. at 424. Noerr, the Court emphasized,

involved "mere attempts to influence the passage or enforcement

of laws," id. (quoting Noerr, 365 U.S. at 135), not an actual

-10-

restraint on price and output, id. at 423. The Noerr exception

to antitrust liability thus was inapplicable to the lawyers'

boycott. Id. at 428.

The district court here sought to distinguish Trial Lawyers

from the case before it, at least in part, because the

anticompetitive conspiracy there was directed at the government,

the District of Columbia City Council, as a commercial

participant. Opinion at 20-21. The court appeared to view the

government's role as a purchaser as significant to the Supreme

Court's conclusion that Noerr immunity was unavailable:

The goal of the trial lawyers' conspiracy was to
inflict economic pain on the government, forcing it to
pass legislation. In this case, however, the
Defendants' alleged conspiracy was not intended to harm
the government as a commercial participant in the
marketplace, only to prompt it to pass anticompetitive
legislation.

Opinion at 21. Consequently, the district court seemed to say,

the conspiracy in this case was protected by Noerr.

Trial Lawyers does not establish a "government-as-market-

participant" exception to Noerr. What was significant about the

concerted activity there was not that the government was the

purchaser, but that the defendants had sought to influence the

government through an economic boycott that directly affected the

marketplace by, inter alia, constricting the supply of lawyers

available to represent indigent criminal defendants. The Court

emphasized that Noerr provides immunity when the alleged

restraint of trade is imposed by the government as the intended

consequence of the defendants' concerted activity. It is

-11-

inapplicable when private actors impose the challenged restraint

of trade through a boycott or other traditionally unlawful

economic measure, even when the boycott's sole purpose is to

instigate favorable governmental action.

Whether the boycotted purchaser is the government or a

private individual is irrelevant; the significant factor is

direct market effect.

The restraint of trade that was implemented while the
boycott lasted would have had precisely the same
anticompetitive consequences during that period even if
no legislation had been enacted. In Noerr, the desired

legislation would have created the restraint on the
truckers' competition; in this case the emergency
legislative response to the boycott put an end to the
restraint.

Trial Lawyers, 493 U.S. at 425.

Here, too, the defendants allegedly employed an economic

boycott that beyond doubt "`constituted a classic restraint of

trade within the meaning of Section 1 of the Sherman Act,'" id.,

493 U.S. at 422 (quoting Court of Appeals, 856 F.2d 226, 234

(1988)). Had these or other plaintiffs sought injunctive relief

during the boycott period, or had they sought damages based on

the boycott's direct market effects (such as reduced availability

of insurance or higher prices resulting from reduced competition

during the boycott period), they would have had a viable

antitrust claim. These plaintiffs, however, explicitly have

disclaimed any request for relief based on injury occurring while

-12-

the boycott was in place, before the Maine Legislature passed the

1987 Act.6

In all likelihood, it was the plaintiffs' decision to pursue

only post-legislation damages that influenced the district court

to state broadly that defendants were immune from liability. The

court correctly recognized that a conspiracy to press for

legislation permitting defendants to charge higher rates was

permissible unless it was implemented through an actual restraint

on trade. Because plaintiffs sought no direct market damages

from the boycott, the court evidently treated the boycott not as

a prohibited restraint of trade but as a lobbying effort

equivalent to the unethical and deceptive publicity campaign

waged by the defendants in Noerr.

In so doing, the court may have overstated its holding

unintentionally, permitting the inference drawn by the government

that the boycott itself was being held immune under Noerr. As we

have explained, such a holding would conflict with Supreme Court

caselaw. Defendants' boycott plainly constituted a per se

violation of the Sherman Act even though plaintiffs seek no

marketplace damages resulting from it.

IV.

The central issue before us is whether plaintiffs may

recover damages based on the higher rates they have paid for

workers' compensation insurance since enactment of the 1987

6 We offer no view as to whether plaintiffs would have been
able to prove damages from a constriction of supply or absence of
price competition resulting from the conspiracy.

-13-

legislation. The district court ruled that the state action

doctrine of Parker v. Brown, 317 U.S. 341, precluded such relief

because the rate increases were authorized by the Maine

Legislature, and adopted and implemented by the state's

Superintendent of Insurance.

In Parker, "[r]elying on principles of federalism and state

sovereignty, [the Supreme Court] held that the Sherman Act did

not apply to anticompetitive restraints imposed by the States `as

an act of government.'" City of Columbia v. Omni Outdoor

Advertising, Inc., 111 S. Ct. 1344, 1349 (1991) (quoting Parker,

317 U.S. at 352). The district court believed that the actions

of the legislature and Superintendent of Insurance superseded

defendants' previous conduct, rendering the rate hikes "an act of

government" immune under Parker rather than an injury inflicted

by defendants' conspiracy.

Plaintiffs offer two reasons why the Parker doctrine does

not bar the relief they seek. First, in an argument more heavily

utilized in the district court, plaintiffs maintain that the

defendants' use of unlawful activity to coerce the favorable

legislation makes the Parker doctrine inapplicable. Because the

legislature unlawfully was pressured to act, they contend, the

statute may not be used to insulate defendants from

responsibility. Second, plaintiffs argue that it was not the

legislation simply permitting rate hikes that harmed them, but

the defendants' longstanding conspiracy to charge the maximum

possible rates.

-14-

Neither of these arguments is persuasive. The first

contention, that the defendants' coercive conduct circumscribes

the effect of the legislature's actions, is directly contradicted

by Supreme Court precedent. In a recent case, Omni, 111 S. Ct.

at 1352, the Court reaffirmed its previously stated determination

that Parker immunity turns on who imposed the challenged

restraint, not why:

"[W]here the action complained of . . . was that of the
State itself, the action is exempt from antitrust
liability regardless of the State's motives in taking
the action."

Id. at 1352-53 (quoting Hoover v. Ronwin, 466 U.S. 558, 579-80

(1984)).

Omni rejected a proposed conspiracy exception to the Parker

doctrine that would have denied immunity when government

employees were involved as conspirators with private actors in

the challenged restraint of trade. The Court considered possible

methods for defining a conspiracy exception, including an

approach that would make Parker inapplicable only if, in

connection with the governmental action in question, bribery or

some other violation of state or federal law were established.

Id. at 1353. It ultimately concluded that any such limitation

would be, at best, an imprecise way to determine which

anticompetitive state actions should be exempted from antitrust

liability.

Such unlawful activity has no necessary relationship to
whether the governmental action is in the public
interest. A mayor is guilty of accepting a bribe even
if he would and should have taken, in the public
interest, the same action for which the bribe was paid.

-15-

. . . To use unlawful political influence as the test
of legality of state regulation undoubtedly vindicates
(in a rather blunt way) principles of good government.
But the statute we are construing is not directed to
that end.

Id.

The holding in Omni fully embraces plaintiffs' tendered

coercion exception. Allegations of coercion, like those of

conspiracy, implicate only the off-limits issue of the

legislators' motivation. Omni reaffirms that the state action

protection provided by Parker is not vulnerable to such claims.

Plaintiffs' second theory bears down more closely on the

1987 legislation. Because the statute does not mandate that

insurers charge the maximum rates allowed by the Superintendent,

but merely eliminated the caps imposed by the repealed 1985 Act,

plaintiffs maintain that the higher rates by which they were

damaged resulted from defendants' conspiracy to charge the

maximum rates and not from the legislature's adoption of the

statute. We detect two problems with this argument.

First, the manner in which plaintiffs asserted this theory

before the district court differed in a subtle, yet significant,

way from the approach adopted on appeal. Throughout the

proceedings before the district court, plaintiffs emphasized that

they alleged injury from a conspiracy initiated in the summer and

fall of 1987 to violate the 1985 legislation, which promoted open

competition in the workers' compensation market.

Plaintiffs do not claim that they were injured by
actions mandated by the 1987 legislation. Indeed,
plaintiffs allege not only that the conspiracy began
before the 1987 legislation was even enacted, but that

-16-

the objective of the conspiracy was that very

enactment. Plaintiffs in fact allege that they were
injured by defendants' conspiracy to violate the 1985

legislation. It is therefore the 1985 legislation
against which state action claims must be tested.

Plaintiffs' Memorandum in Opposition to Defendants' Joint Motion

for Summary Judgment, at 18 n.11 (emphasis in original).

At oral argument on the summary judgment motion, plaintiffs

again asserted that it had been unlawful for the defendants to

conspire to increase prices while the 1985 legislation governed.

See App. at 720. When the district court asked why the

defendants' actions were not protected in light of their "acting

within the framework set up by the legislature in the enactment

of rates," plaintiffs' counsel responded that "one needs to be

clear on the time frame." Id. at 729. He continued:

At the time the conspiracy was hatched and effectuated
in summer and fall of 1987, the policy of the State of
Maine was open competition in workers' comp. The
policy of the State of Maine was, "Go compete with each
other."

And these defendants had a private agreement, in
effect, not to compete and to boycott consumers and the
state.

Id.

Thus, the argument to the district court focused on conduct

leading up to the 1987 act: the defendants unlawfully conspired

to charge higher rates, and obtained permission to do so through

unlawful means, making the new rates wholly a result of

defendants' unlawful conduct. Moreover, the plaintiffs argued,

even though the specific harm for which they sought damages did

not occur until after the law was changed and higher rates

-17-

authorized, defendants had to be held responsible so that their

past illegal conduct would not be immunized retroactively.

Failing to hold them liable, plaintiffs argued,

would lead to the anomalous result that unsuccessful

boycotts (i.e. boycotts which do not successfully

coerce governmental action) would be antitrust
violations, but that successful boycotts (i.e. boycotts

to which government succumbs in order to avoid chaos or
disaster) would be immunized.

Plaintiffs' Memorandum in Opposition, at 35-36 (emphasis in

original) (footnote omitted).7

The argument on appeal unquestionably adds a new dimension.

Plaintiffs now contend that, after passage of the 1987 act,

defendants again violated antitrust laws by conspiring to refuse

to sell below the new maximum rates established by the

Superintendent of Insurance. That agreement is not entitled to

state action immunity, plaintiffs suggest, because the provision

in the 1987 Act allowing independent ratesetting demonstrates

that state policy still favors competition. Consequently,

plaintiffs contend that defendants should be held liable for the

rate increases.8

7 As we made clear in Section III, the response to this
argument is that unlawful boycotts with direct marketplace impact
will result in accountability for the market injury, regardless

of their success in inducing governmental action.

8 We note that some portions of plaintiffs' appellate brief
retain the focus on the 1985 legislation:

Plaintiffs do not challenge the Defendants'
"participation in ratesetting proceedings" in 1988
after the 1987 legislation was enacted repealing the
1985 Competitive Rating Act. What Plaintiffs challenge
is Defendants' conspiracy begun in 1986 and 1987, at a

time when Maine law specifically prohibited such

-18-

This link between plaintiffs' conspiracy allegation and the

1987 Act never was offered to the district court; indeed, as

noted above, plaintiffs expressly disclaimed the new statute's

relevance to the Parker issue. The conspiracy achieved success,

plaintiffs asserted, when the State enacted the law allowing

higher premiums. See Memorandum in Opposition to Summary

Judgment, at 2-3 (quoted in District Court Opinion, at 3). Led

by these arguments, the district court never considered whether

the defendants could be held responsible for the rate increases -

- despite authorization of those rates by the state -- if they

had conspired not to deviate below the maximum rate.

Whether plaintiffs sufficiently preserved this argument need

not unduly detain us, however, because the theory is in any event

unavailing. When the legislature enacted the 1987 statute, it

did not simply eliminate the ceiling on the permissible rates for

workers' compensation insurance, but it also moved away from the

state's previous pro-competitive policy toward ratesetting. The

1987 Act provided for joint rate filings9 and, in our view, it

conspiracies, to constrict supply, to fix prices, and
to boycott consumers in order to coerce the removal of

the existing price ceiling.

Plaintiffs' Brief at 31 (additional emphasis added).

9 It did so somewhat indirectly through repeal of the 1985
Act, which meant that the joint ratemaking provisions that then
existed for all lines of insurance sold in Maine again were
applicable to workers' compensation insurance. In 1989, the
legislature revised the general insurance ratemaking system to
encourage competition, leaving the joint ratemaking provisions
applicable only to the workers' compensation providers. Compare

Me. Rev. Stat. Ann. tit. 24-A, 2309 (West 1990) with Me. Rev.

Stat. Ann. tit. 24-A, 2309 (West Supp. 1992).

-19-

must be construed as implicitly condoning an agreement among

insurers to charge the rates they jointly propose, subject to

approval by the Superintendent. When insurers work together

within a state regulatory system to advocate rates that they all

presumably believe are appropriate for workers' compensation

insurance, we fail to see how it could be illegal price fixing

for them also subsequently to agree to charge the rates allowed

by the state, particularly when the approved rates fall below the

jointly proposed rates.

At a minimum, it must be lawful for insurers to agree to

charge the approved rate where, as here, the Superintendent's

obligation is to establish rates that are "[j]ust and reasonable"

and "[b]ased only on a just and reasonable profit." Me. Rev.

Stat. Ann. tit. 24-A, 2363 (7)(A)(1), (2). Thus, while the

statute stipulates that these rates set the upper limit on

permissible charges, id. at 2362, the expectation clearly is

that the Superintendent's rates are the ones that generally will

be appropriate for, and thus used by, all insurers. In this

context, the legislature evidently viewed the sort of "price

fixing" alleged by plaintiffs as benign; notably absent from the

1987 statute is a provision contained in the 1985 Act prohibiting

insurers from agreeing "to adhere to or use a rate or rating

plan," id. at 2347 (2) (1985) (repealed).

Plaintiffs rely on the provision allowing downward rate

deviation to support their claim that defendants' conspiracy to

charge a uniform rate was unauthorized and, consequently, not

-20-

immunized under Parker. But the fact that insurers may charge

less than the approved rate is of little significance when it is

juxtaposed with the uniform approach to ratemaking that is the

overriding characteristic of the reformed system. On its own,

the permissive provision certainly does not establish a state

policy favoring competitive pricing. Moreover, the Supreme

Court, in Southern Motor Carriers Rate Conference v. United

States, 471 U.S. 48 (1985), explicitly held that Parker immunity

is available to private parties acting pursuant to a regime of

collective ratemaking that is authorized, though not compelled,

by the state.

Southern Motor Carriers involved a challenge to the joint

activities of motor common carrier rate bureaus in four states

where carriers were permitted to agree on rate proposals before

their submission to state agencies. In the course of its

decision, the Court reaffirmed the two-pronged test set forth in

California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,

445 U.S. 97, 105 (1980), for determining whether the

anticompetitive conduct of private parties within a state

regulatory scheme is shielded from the antitrust laws:

First, the challenged restraint must be "`one clearly
articulated and affirmatively expressed as state
policy.'" Second, the State must supervise actively
any private anticompetitive conduct.

471 U.S. at 57 (citations omitted).

The justices then considered whether the actions of a

private party can be attributed to a clearly articulated state

policy, within the meaning of the Midcal test's first prong, even

-21-

if the state does not compel the challenged anticompetitive

activity. Id. at 59-60. The Court observed that a compulsion

requirement would reduce the range of alternatives available to a

state that wished to regulate a given industry -- thereby

negatively affecting principles of federalism -- while perhaps

also causing greater restraints on trade -- thereby impairing the

goal of the antitrust laws to ensure "unfettered competition in

the marketplace," id. at 61. Declining to "believe that Congress

intended to resolve conflicts between two competing interests

[federalism and competition] by impairing both more than

necesssary," id., the Court concluded that "a state policy that

expressly permits, but does not compel, anticompetitive conduct

may be `clearly articulated' within the meaning of Midcal," id.

(emphasis in original).

In this case, it is manifestly clear that defendants'

ratemaking activities meet both prongs of the Midcal test. The

new scheme was adopted by the legislature, fulfilling the state

policy prong of the test, and the Superintendent's involvement in

reviewing and modifying the insurers' proposed rates

unquestionably meets prong two's requirement of active state

supervision. Indeed, plaintiffs expressly acknowledge that

Midcal is satisfied with respect to the ratemaking proceedings.

See Reply Brief, at 19 n.15. Plaintiffs instead hammer on

defendants' "converting the results of that ratemaking

proceeding, i.e. a schedule of maximum or ceiling prices, into a

private agreement to uniformly charge the maximum price, and to

-22-

refuse to deal at prices below that level." Id. (emphasis in

original).

This argument misfires because it fails to take into account

the changed landscape. Even if defendants violated the Sherman

Act in the late summer and early fall of 1987 by conspiring to

raise the maximum prices they could charge beyond those permitted

by the 1985 Act, it does not necessarily follow that it was

unlawful for them to agree to charge the rate subsequently

approved by the Superintendent pursuant to the 1987 Act. Once

the legislature acted in November 1987, defendants' conduct had

to be assessed in light of the new state policy and procedures.

As we have discussed, the 1987 Act endorsed cooperative

ratesetting and anticipated that most, if not all, insurers would

charge the newly authorized rates. Accordingly, the damages

sought by plaintiffs -- the differential between the rates

allowed under the 1985 Act and the new rates charged by

defendants under the 1987 Act -- must be viewed as a product of

state action. The district court therefore correctly concluded

that, under Parker, defendants may not be held accountable for

this claimed injury.

V.

In summary, we hold that the economic boycott and price

fixing conspiracy allegedly conducted by defendants in the summer

and early fall of 1987 constituted a per se violation of the

-23-

Sherman Act, and did not fall within the Noerr doctrine's

protection for concerted activity designed to elicit favorable

legislation. But plaintiffs have not sought damages for direct

marketplace injury inflicted by that conspiracy.

The monetary damages alleged by plaintiffs -- the amount of

increase in their workers' compensation insurance rates under the

1987 statutory scheme allegedly coerced by defendants -- are not

recoverable from the insurers. Because the state authorized

collective ratemaking and closely supervised the setting of

higher rates, any agreement among defendants to charge the

maximum authorized rates is permissible, and defendants are

immune from liability for the increase under the Parker doctrine.

Affirmed.

-24-