OPINION OF THE COURT
STAPLETON, Circuit Judge:
Appellant Armstrong Surgical Center, Inc. (the “Surgical Center”) contends that Armstrong County Memorial Hospital and nineteen of its staff physicians (the “Hospital Defendants”) conspired to prevent it from establishing an ambulatory surgery center, thereby restraining and monopolizing trade in violation of sections 1 and 2 of the Sherman Act. The District Court dismissed the complaint after concluding that the alleged conduct was immune from antitrust scrutiny. We will affirm.
I.
We review the District Court’s order dismissing the Surgical Center’s complaint de novo. See Jeremy H. v. Mount Lebanon Sch. Dist., 95 F.3d 272, 277 (3d Cir.1996). In reviewing that order, we employ the same standard the District Court used, accepting as true all factual allegations contained in the complaint and all reasonable inferences that can be drawn therefrom. See Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 411 n. 2 (3d Cir.), cert. denied, - U.S. -, 118 S.Ct. 435, 139 L.Ed.2d 335 (1997).
II.
The Surgical Center has plans to build a free-standing ambulatory surgery center in the city of Kittanning, Armstrong County, Pennsylvania. If constructed, that facility would provide outpatient surgical services, including both general surgery and various specialities. Currently, the Hospital is the only facility with operating rooms in Armstrong County, and the nineteen staff physician defendants perform the vast majority of surgeries in the county. Only one independent ambulatory sur *156 gery center operates in the four counties that border Armstrong County, and this center is approximately fifty miles from the Surgical Center’s proposed site. If constructed, the Surgical Center’s facility would compete directly with the Hospital and its staff physicians in the outpatient surgery market. Moreover, the Surgical Center alleges that it would offer outpatient surgical services at prices significantly lower than the Hospital’s.
Under the Pennsylvania Health Care Facilities Act, anyone proposing to establish a new health care facility must first obtain a Certificate of Need (“CON”) from Pennsylvania’s Department of Health. See Pa. Stat. Ann. tit. 35, § 448.701(a)(2). The Act seeks to ensure “the orderly and economical distribution of health care resources to prevent needless duplication of services.” Id. at § 448.102. The Department individually reviews CON applications in an extensive proceeding consisting of an investigation, an evaluation of submitted materials, and a public hearing. During this review, the Department considers various health planning issues, including the adequacy of existing health care providers and the need for additional services or facilities. See id. § 448.707. Interested parties, including health care providers who supply similar services in the area, may petition for public meetings or hearings and submit information to the Department on any CON application. See id. §§ 448.103, 448.704(b).
In March of 1991, the Surgical Center filed an application for a CON with the Department as required. Thereafter, according to the Surgical Center’s complaint, the Hospital defendants, including fourteen physicians who originally supported the Surgical Center’s project, entered into a conspiracy to subvert establishment of the new facility. The alleged conspiracy involved: (1) the physicians announcing that they would boycott the proposed outpatient center and (2) the Hospital defendants submitting false and misleading information to the Department. Specifically, the Surgical Center alleges that the Hospital defendants informed the Department that its nineteen physicians would not use the Surgical Center facility in the hope that this information would convince the Department that the proposed facility could not meet the statutory requirements for a CON. In addition, the Surgical Center claims that the Hospital defendants sought to mislead the Department into believing that the Hospital intended to open its own outpatient center, which was then under construction, and that this facility would satisfy all of Armstrong County’s outpatient surgery needs. The Hospital’s partially constructed facility was designed to provide alternative space for outpatient surgeries then conducted in three of the Hospital’s six mixed-use operating rooms. According to the Surgical Center, however, the Hospital defendants knew that the construction of the Hospital’s facility had been stopped with only the shell of the building completed and that the Hospital had made no commitment to resume construction. Despite this knowledge, it is alleged that the Hospital defendants falsely represented to the Department that its new center was either in use or very near completion.
The Department denied the Surgical Center’s CON application. The Surgical Center appealed that decision to the Commonwealth of Pennsylvania State Health Facility Hearing Board, which conducted its own hearing and received additional evidence.[1] The Board affirmed the Department’s decision after finding that (1) the Surgical Center’s facility would result in needless duplication of existing facilities and health care services, and (2) the Surgical Center would not be economically via *157 ble because the nineteen Hospital surgeons who performed ninety percent of Armstrong County’s surgeries would not use the Surgical Center facility. According to the Board, “the most damaging evidence [against the Surgical Center’s application] is that the number of physicians who might have been expected to support the facility decreased significantly after the Applicant had submitted its projections.” The Surgical Center appealed the Board’s decision to the Commonwealth Court of Pennsylvania, which affirmed the Board’s decision.
The Surgical Center filed this antitrust action seeking treble damages for, inter alia, denial of the CON, lost value of the CON and the proposed outpatient center, and lost profits. It contends that the Hospital defendants’ conspiracy caused the Department to deny its CON application. The District Court dismissed the Surgical Center’s suit for failure to state a claim upon which relief may be granted, see Fed.R.Civ.P. 12(b)(6), holding that the Hospital defendants’ conduct was immune from antitrust scrutiny.
III.
We begin by considering the Surgical Center’s claim that the Hospital defendants conspired to boycott its outpatient center, thereby violating sections 1 and 2 of the Sherman Act. To state a claim under section 1, a plaintiff must allege “a contract, combination or conspiracy; a restraint of trade; and an effect on interstate commerce.” Fuentes v. South Hills Cardiology, 946 F.2d 196, 201 (3d Cir.1991). Section 2 of the Sherman Act prohibits both monopolies and attempts to monopolize. See 15 U.S.C. § 2. A claim under section 2 must allege “(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.” Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 113 S.Ct. 884, 890-91, 122 L.Ed.2d 247 (1993); see also Schuylkill Energy Resources, 113 F.3d at 413.
“A classic boycott involves concerted action with a purpose either to exclude a person or group from the market, or to accomplish some other anticompetitive object, or both.” Fuentes, 946 F.2d at 202 (internal quotes omitted); see also St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 541, 98 S.Ct. 2923, 2929-30, 57 L.Ed.2d 932 (1978). Such commercially motivated group boycotts, or concerted refusals to deal, generally are considered illegal per se under section 1. See F.T.C. v. Superior Court Trial Lawyers Ass’n, 493 U.S. 411, 431-32, 110 S.Ct. 768, 779-80, 107 L.Ed.2d 851 (1990); Weiss v. York Hospital, 745 F.2d 786, 818 (3d Cir.1984). When a boycott’s aim is to monopolize trade, it might also violate section 2. See Retina Associates v. Southern Baptist Hosp. of Fla., Inc., 105 F.3d 1376, 1384 (11th Cir.1997).
The Hospital defendants do not deny that the complaint alleges a threat of a boycott that might under other circumstances constitute an antitrust violation. They insist, however, that the complaint alleges facts establishing that they are immune from antitrust liability. Specifically, they contend that their activities are insulated from antitrust scrutiny because their allegedly wrongful conduct occurred in the context of supplying information to the Pennsylvania Department of Health during the Surgical Center’s CON application process and because the injuries alleged resulted solely from the Department’s denial of the CON.
In Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), an agricultural producer challenged a marketing program adopted by California’s Director of Agriculture as invalid under the Sherman Act. The program served to restrict competition among growers and maintain prices in commodity distribution. “Relying on principles of federalism and state sovereignty, [the Supreme Court] held that the Sherman Act did not apply to anticom- *158 petitive restraints imposed by the States ‘as an act of government.’ ” City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991).
In Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Supreme Court held that antitrust liability cannot be predicated solely on petitioning to secure government action even where those efforts are intended to eliminate competition. As the Court explained in Noerr, “[t]he right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend on their interest in doing so.” Noerr, 365 U.S. at 139, 81 S.Ct. 523.
The Parker doctrine and the Noerr-Pennington doctrine have been interpreted as complementing each other to protect the two related but distinct principles upon which they are founded. As the Supreme Court has more recently observed:
Parker and Noerr are complementary expressions of the principle that the antitrust laws regulate business, not politics; the former decision protects the States’ acts of governing, and the latter the citizens’ participation in government.
Omni, 499 U.S. at 383, 111 S.Ct. 1344.
As the Surgical Center emphasizes, however, the immunity afforded to a private party under Noerr is not unlimited. Where the challenged private conduct is only “sham” petitioning — i.e., where it “is not genuinely aimed at procuring favorable government action as opposed to a valid effort to influence government action”— Noerr immunity is not available. Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc. 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (“PRE”). In essence, sham petitioning entails “the use of the governmental process-as opposed to the outcome of that process — -as an anticompetitive weapon.” PRE, 508 U.S. at 61, 113 S.Ct. 1920 (emphasis added). Accordingly, the sham petitioning exception does not apply in a case like the one before us where the plaintiff has not alleged that the petitioning conduct was for any purpose other than obtaining favorable government action.[2]
*159 It is also true that a private party can be held liable even for bona-fide petitioning conduct where that conduct has caused direct antitrust injury in the market place. F.T.C. v. Superior Court Trial Lawyers Ass’n., 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). In Trial Lawyers, for example, the public defenders of the District of Columbia engaged in a concerted refusal to represent indigent defendants in order to pressure the District into raising the hourly rate paid. The Court held that the defendants could be held liable under the Sherman Act for injuries that resulted directly from the boycott, even though the boycott was intended to secure government action.
The limitation on Noerr immunity recognized in Trial Lawyers is inapplicable, however, to a case where the sole antitrust injury is caused directly by the government action that the private defendant has helped to secure. Thus, even where the same petitioning conduct might give rise to antitrust liability for injury directly caused to a competitor in the marketplace, if relief is sought solely for injury as to which the state would enjoy immunity under Parker, the private petitioner also enjoys immunity. As the Supreme Court explained in Allied Tube & Conduit Corp. v. Indian Head, Inc.:
Concerted efforts to restrain or monopolize trade by petitioning government officials are protected from antitrust liability under the doctrine established by [Noerr; Pennington, and California Motor Transport Co. v. Trucking Unlimited]. The scope of this protection depends, however, on the source, context, and nature of the anticompetitive restraint at issue. “[WJhere a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action,” those urging the governmental action enjoy absolute immunity from antitrust liability for the anticompetitive restraint.
486 U.S. 492, 499, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988) (citations omitted) (quoting Noerr, 365 U.S. at 136, 81 S.Ct. 523).
We applied this principle in Mass. School of Law at Andover, Inc. v. American Bar Assoc., 107 F.3d 1026 (1997) (“MSL”). There, the plaintiff, an unaccredited law school, complained of injuries resulting from the fact that, without ABA accreditation, the school’s graduates were refused admittance to most states’ bar examinations. We identified the critical issue as “whether state or private conduct caused the injury MSL alleges it suffered.” Id. at 1035. Looking to the source of the restraint-causing injury, we found that because “every state retains the final authority to set all the bar admission rules,” any injury the plaintiff suffered “is the result of state action and thus immune.” Id. at 1035-36.
This reasoning was similarly applied in Sandy River Nursing Care v. Aetna Casualty, 985 F.2d 1138, 1147 (1st Cir.1993), where the defendant insurers allegedly employed a boycott in an effort to force the legislature to enact legislation permitting rate increases. Because all the plaintiffs claimed injuries were associated with increased rates charged by the defendants after the legislature removed the rate limits, the court concluded that “[plaintiffs *160 injuries] must be viewed as a product of state action” and that the defendants were, accordingly, immune from liability.
Here, looking to the source of the complained of injuries, we find that all of the Surgical Center’s alleged injuries arise solely from the denial of the CON: the denial of the ability to operate the proposed facility; the loss of the CON’s value, the value of the facility, and the value of the operation’s proceeds; the delay in securing the CON; and “other related losses.” Each of the injuries the plaintiff claims is a direct result of the Department’s decision to deny the plaintiffs application for a CON.[3]
In sum, where, as here, all of the plaintiffs alleged injuries result from state action, antitrust liability cannot be imposed on a private party who induced the state action by means of concerted anticompeti-tive activity. It follows that the complaint fails to state a boycott claim upon which relief can be granted. See Noerr, 365 U.S. at 136, 81 S.Ct. 523; Parker, 317 U.S. at 352, 63 S.Ct. 307.
IV.
The Surgical Center’s second claim is that the Hospital defendants, as a part of their conspiracy, misled the Department, the Board, and the Commonwealth Court into believing that the Hospital’s partially constructed facility would soon open and meet the needs of the relevant market when the Hospital defendants knew that the facility would not be completed. The resulting injury, it is said, was the denial of the Surgical Center’s application for a CON. The Center would have us deny antitrust immunity to the Hospital defendants on the grounds that they successfully opposed the issuance of a CON using information known to be false.
Although the Supreme Court suggested in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 512-13, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), that petitioning activity involving knowingly false information submitted to an adjudicative tribunal might not enjoy antitrust immunity, the Court has never so held. See PRE, 508 U.S. at 61 n. 6, 113 S.Ct. 1920 (suggesting that the issues of whether there is a misrepresentation exception to Noerr and, if so, the extent thereof, remain open). Moreover, since California Motor, the Supreme Court has decided a case that casts doubt on whether such an exception exists under any circumstances and dictates that, in the circumstances of this case, we honor the Hospital defendants’ claim to immunity.
In Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), Columbia Outdoor Advertising, Inc. (“COA”) controlled 95 percent of the billboard rental business in Columbia, South Carolina. According to respondent Omni Outdoor Advertising, Inc. (“Omni”), a newcomer to the market, COA and city officials conspired to restrain competition in the market through adoption of a zoning ordinance limiting the size, spacing, and location of billboards in the city. Omni filed suit against the city and COA alleging a violation of the Sherman Act. A jury found the existence of a conspiracy between the city and COA, and both were held liable for Omni’s injuries despite their insistence that they were entitled to antitrust immunity under Parker and Noerr, respectively.
The Court first concluded that Omni’s alleged injury was the result of state action. South Carolina had authorized its municipalities to regulate land use and construction and, in doing so, had provided a “clear articulation of state policy to authorize anticompetitive conduct by the mu *161 nicipality in connection with its regulation.” Omni, 499 U.S. at 372, 111 S.Ct. 1344 (quoting Town of Hallie v. City of Eau Claire, 471 U.S. 34, 40, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985)). As the Court explained:
The very purpose of zoning regulation is to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition, particularly on the part of new entrants. A municipal ordinance restricting the size, location, and spacing of billboards (surely a common form of zoning) necessarily protects existing billboards against some competition from newcomers.
Id. at 373, 111 S.Ct. 1344 (footnote omitted).
Having thus concluded that “the city’s restriction of billboard construction was prima facie entitled to Parker immunity,” id. at 374, 111 S.Ct. 1344, the Court turned to the issue of whether the existence of a conspiracy between city officials and COA had stripped the city of that immunity. Itfirst noted the foundation of Parker immunity:
The rationale of Parker was that, in light of our national commitment to federalism, the general language of the Sherman Act should not be interpreted to prohibit anticompetitive actions by the States in their governmental capacities as sovereign regulators.
Id. It then observed that if conspiracy was taken to mean “nothing more than an agreement to impose the regulation in question,” the purpose of Parker immunity would be defeated because “it is both inevitable and desirable that public officials often agree to do what one or another group of private citizens urges upon them.” Id. at 375, 111 S.Ct. 1344.
Because the jury had been instructed that a conspiracy was “an agreement ... to accomplish an otherwise lawful result in an unlawful manner,” id. at 376 n. 5, 111 S.Ct. 1344, the Court next considered whether Parker immunity is lost when it is shown that an agreement between the.defendants involved governmental corruption, bribery, or other violations of state or federal law. It held that Parker immunity remains in such circumstances. The Court found “impractical” the contention that Parker immunity is forfeited by governmental corruption, “defined variously as ‘abandonment of public responsibilities to private interests,’ ... ‘corrupt or bad faith decisions,’ ... and ‘selfish or corrupt motives.’ ” Id. at 376, 111 S.Ct. 1344. Such a rule would call upon antitrust courts to speculate as to whether state action purportedly taken in the public interest was the product of an honest judgment or desire for private gain. The Court stressed that Parker “was not meant to shift [judgments about the public interest] from elected officials to judges and juries.” Id. at 377, 111 S.Ct. 1344.
With respect to the contention that Parker immunity should be forfeited at least where bribery or other illegal activity may have subverted the state decision making process, the Court observed that this approach had “the virtue of practicality but the vice of being unrelated to” the purposes of the Sherman Act and Parker. Id. at 378, 111 S.Ct. 1344. It chose to rely on sanctions other than the Sherman Act to discourage such behavior:
To use unlawful political influence as the test of legality of state regulation undoubtedly vindicates (in a rather blunt way) principles of good government. But the statute we are construing is not directed to that end. Congress has passed other laws aimed at combating corruption in state and local governments.
Id. at 378-79, 111 S.Ct. 1344.
For these reasons, the Court rejected “any interpretation of the Sherman Act that would allow plaintiffs to look behind the actions of state sovereigns to base their claims on [charges that the state’s decision making process was corrupted by bribery or other unlawful activity].” Id. at *162 379, 111 S.Ct. 1344. It concluded its discussion of the city’s immunity by “reiterating] that, with the possible market participant exception,[4] any action that qualifies as state action is ‘ipso facto ... exempt from the operation of the antitrust laws.’ ” Id. at 379, 111 S.Ct. 1344 (emphasis in original) (quoting Hoover v. Ronwin, 466 U.S. 558, 568, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984)).
Turning to the liability of Omni, the Court addressed whether Noerr’s immunity for private parties was subject to any of the exceptions that had been urged in the context of Parker immunity.[5] It declined to restrict Noerr immunity in this way for the same reason it had declined to so restrict Parker immunity:
Insofar as the identification of an immunity-destroying “conspiracy” is concerned, Parker and Noerr generally present two faces of the same coin.... The same factors which, as we have described above, make it impracticable or beyond the purpose of the antitrust laws to identify and invalidate lawmaking that has been infected by selfishly motivated agreement with private interests likewise make it impracticable or beyond that scope to identify and invalidate lobbying that has produced selfishly motivated agreement with public officials. “It would be unlikely that any effort to influence legislative action could succeed unless one or more members of the legislative body became ... ’coconspirators’ ” in some sense with the private party urging such action. And if the invalidating “conspiracy” is limited to one that involves some element of unlawfulness (beyond mere anticompetitive motivation), the invalidation would have nothing to do with the policies of the antitrust laws. In Noerr itself, where the private party “deliberately deceived the public and public officials” in its successful lobbying campaign, we said that “deception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned.” 365 U.S. at 145, 81 S.Ct. 523.
Id. at 383-84, 111 S.Ct. 1344 (emphasis added).
The teachings of Omni are pertinent here. Considerations of federalism require an interpretation of the Sherman Act that forecloses liability predicated on anticompetitive' injuries that are inflicted by states acting as regulators. Liability for injuries caused by such state action is precluded even where it is alleged that a private party urging the action did so by bribery, deceit or other wrongful conduct that may have affected the decision making process. The remedy for such conduct rests with laws addressed to it and not with courts looking behind sovereign state action at the behest of antitrust plaintiffs. Federalism requires this result both with respect to state actors and with respect to private parties who have urged the state action.
Here, the Department is authorized by state statute to regulate the number, size, and spacing of health care facilities. Like the statute in Omni this statute provides a “clear articulation of state policy” which authorizes the Department “to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition, particularly on the part of new entrants.” Id. at 373, 111 S.Ct. 1344. While it is true that the challenged decision of the Department involved an individualized application of established criteria, rather than the establishment of criteria as in *163 Omni, the Department’s action was every bit as essential to the execution of the sovereign’s regulatory policy as was the adoption of the zoning ordinance by the Columbia city council.
The Surgical Center’s CON application called upon the Department to determine whether the opening of a new ASC was in the public interest. The Department conducted its own investigation and then held a hearing at which all interested parties had the opportunity to tender evidence and argument. It then made findings and determined that the issuance of the CON was not in the public interest. After a second hearing, that determination was concurred in by the Board, and the Commonwealth Court thereafter concluded that the Board’s decision was supported by substantial evidence.
It is not clear to us that the issue of whether the Hospital’s new facility would be completed was considered important by the Department or the Board. Neither made an express finding on that issue.[6] It is clear from the Board’s written decision, however, that the Board heard evidence on the issue, knew construction had been halted, and believed “there was credible evidence that the project ha[d] not been abandoned.” Board Op. at 14. Thus, to the extent this issue was material, the record reflects that the decision makers recognized that there was a dispute and made a credibility determination concerning it.
On the facts alleged in the complaint, it is also clear that the state decision makers were disinterested, conducted their own investigation, and afforded all interested parties an opportunity to set the record straight. The initial decision was then twice reviewed. Finally, anyone who believed that a fraud was committed on the Department or Board could have moved to reopen the proceeding and attempted to persuade them that they were materially misled. See, e.g., 1 Pa.Code §§ 35.231, 35.233 (authorizing a reopening of an administrative proceeding on motion of a participant or by the agency whenever the public interest requires). As matters currently stand, however, the Department’s decision concerning where the public interest lies remains in place as the final decision of the Board and the judgment of the Commonwealth Court.
In these circumstances, Omni compels us to affirm the District Court.[7] Indeed, such a result seems to follow, a fortiori, *164 from Omni given the conceded presence here of disinterested decision makers, an independent investigation, an open process, and extensive opportunities for error correction. The risk that the plaintiffs injury is not the result of a bona fide execution of state policy is far less substantial here than in Omni and there is, accordingly, far less justification for federal court review of the state’s policy judgment. For these reasons, we must decline the Surgical Center’s invitation to look behind the decisions of the Department, the Board, and the Commonwealth Court. Rather, based on Omni, we are constrained to honor the Hospital defendants’ claim to Noerr immunity.[8]
V.
Accordingly, we will affirm the District Court’s order dismissing the Surgical Center’s complaint for failure to state a claim upon which relief may be granted.

. The Act of Feb. 23, 1996, P.L. 27, 1996 Pa. Laws 10, § 9(a) (repealing Pa. Stat. Ann. tit. 35, §§ 448.501-448.507), has since eliminated the Health Facility Hearing Board and transferred its review functions to the Health Care Policy Board. This change does not affect our review of the Surgical Center's appeal.

. Plaintiffs allegations that both the threatened boycott and the claimed misrepresentations were intended to secure denial of the CON distinguish the situation before us from cases like Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119 (3d Cir.1999), that deal with the "sham” exception to the Noerr doctrine. In Cheminor, the defendant, Ethyl, had petitioned the International Trade Commission and the Department of Commerce, alleging that Cheminor was dumping bulk ibuprofen on the U.S. market and seeking the imposition of extra duties to offset the alleged subsidies that enabled it to do so. Although Che-minor withdrew from the U.S. market prior to a final decision on Ethyl’s petition, it alleged injuries resulting from the petition and brought an antitrust suit against Ethyl. In response to Ethyl's reliance on Noerr immunity, Cheminor asserted that the petition was a "sham” and Noerr immunity thus was unavailable. We analyzed and rejected Chemi-nor’s argument under the teachings of PRE.
PRE holds that Noerr immunity is lost when the petition is a "sham,” i.e., "is not genuinely aimed at procuring favorable government action.” PRE, 508 U.S. at 58, 113 S.Ct. 1920. As we noted in Cheminor, PRE further holds that determining whether a petition is a sham requires a two-step process. First, the Court determines whether the petition is "objectively baseless;” if not, the petition is not a sham without regard to the subjective intent of the petitioner. Second, if the petition is objectively baseless (and only if it is objectively baseless), the Court is to look to the petitioner's "subjective motivation” and determine "whether the baseless [petition] conceals an attempt to interfere directly with the business relationships of a competitor through the use of governmental process — as opposed to the outcome of that process — as an anticompetition weapon.” 508 U.S. at 60-61, 113 S.Ct. 1920 (emphasis in original) (quoting Noerr, 365 U.S. at 144, 81 S.Ct. 523, and Omni, 499 U.S. at 380, 111 S.Ct. 1344).
Cheminor holds that where the petitioning effort allegedly involves misrepresentations, the Court, at the first step, must "determine whether [the] petition was objectively baseless *159 under[PRE ] without regard to those facts that the [plaintiff] alleges [the petitioner] misrepresented." Cheminor, 168 F.3d at 123 (emphasis in original). Such a determination is unnecessary here, however, because the plaintiff affirmatively alleges that defendants’ purpose was to secure the outcome of the process— denial of the CON. Thus, even if defendants' opposition to the CON were found to be objectively baseless (a conclusion that could not be reached on this record), defendants would pass the second, "subjective” test and the sham exception to Noerr immunity would be inapplicable here.
While Cheminor focuses on the sham exception to Noerr immunity, it also rejects Chemi-nor’s more general argument that "Noerr-Pennington immunity does not apply at all to petitions containing misrepresentations.” Id. To that extent, it supports the conclusion reached below with respect to the misrepresentation claim.

. While plaintiff also claims "increased costs, legal and otherwise, in pursuing Plaintiff's application for a CON,” the referenced costs apparently relate to the appeal plaintiff prosecuted from the Board's decision. Plaintiff does not contend that it incurred costs at the Board level in excess of the cost it would have incurred had the threat of a boycott (or the alleged misrepresentations) not been made.

. The referenced possible exception relates to state action as a purchaser or seller in the market rather than as a sovereign regulator.

. The Court first concluded that the "sham'' exception to Noerr immunity was inapplicable because that exception "encompasses situations in which persons use the governmental process — as opposed to the outcome of that process — as an anticompetitive weapon.” Id. at 380. COA had sought to use only the outcome of the process to suppress competition.

. The Board’s “need projection formula” projected a need for 6.5 operating rooms. The Hospital currently had six general purpose operating rooms and a room used for "short procedures” such as endoscopies, colonosco-pies and sigmoidoscopies. If and when the Hospital’s proposed facility was completed, three of the general purpose operating rooms would be closed and the ambulatory surgical services provided in the main building would be provided in the new facility. The Surgical Center proposed to add two operating rooms under circumstances where the State Health Plan’s need-project formula indicated, at most, need for one additional (seventh) operating room. In terms of the population to be served and the surgical services to be rendered, the Surgical Center’s project would do little other than raise the number of operating rooms in Armstrong County above the limit set by the State Health Plan. The Board, therefore, concluded that approval of the instant CON application would result in needless duplication of existing facilities and health care services. While the Surgical Center projected a higher need and suggested that its facility would serve a larger area than the hospital, the Board found its projections flawed. The opinion of the Commonwealth Court establishes that it also understood this to be the basis for the Board's ruling, a basis for which it found support in the record.

. We acknowledge that the result we reach is in conflict with the holding of the court in St. Joseph's Hospital v. Hospital Corp. of America, 795 F.2d 948 (11th Cir.1986) and with the analysis of the courts in Kottle v. Northwest Kidney Centers, 146 F.3d 1056 (9th Cir.1998) and Potters Medical Center v. City Hospital Ass'n., 800 F.2d 568 (6th Cir.1986). To the extent of that conflict, we respectfully disagree with the views there expressed. We note that the courts in St. Joseph’s Hospital and Potters Medical Center did not have the benefit of the Supreme Court’s 1991 decision in Omni and that Kottle’s brief analysis does not reference that decision.

. This is not a case like Walker Process Equip., Inc. v. Food Machinery and Chem. Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), or Woods Exploration & Prod. Co. v. Aluminum Company of America, 438 F.2d 1286 (5th Cir.1971). In Walker, the state action was the issuance of a patent which allegedly had been procured by fraud. The attempted enforcement of the patent against the plaintiff was held actionable under the Sherman Act. The decision making process there was an ex parte one in which the Patent Office was wholly dependent on the applicant for the facts. While the Patent Office can determine the prior act from its own records, it effectively and necessarily delegates to the applicant the factual determinations underlying the issuance of a patent. Accordingly, when the applicant has submitted false factual information, the state action is dependent on financially interested decision making. See Einer Elhauge, Making Sense of Antitrust Petitioning Immunity, 80 Calif. L.Rev. 1177, 1249 (1992) (suggesting that the immunity exception recognized in Walker is "very narrow" and applies only when financially interested parties essentially made the factual determinations that triggered the governmental restraint). The same is true of the situation in Woods where the Texas Railroad Commission was wholly dependent on the antitrust defendants for the factual information on which it predicated its allocation of production from a given field.